## STATE v. WHITE.

### No. 2224.    Decided January 31, 1912 (121 Pac. 579).

1. CRIMINAL LAW—HARMLESS ERROR. Although the act of the clerk in restoring to the jury box, before it was exhausted, slips containing the names of jurors which had been drawn therefrom, was a departure from Comp. Laws 1907, sec. 1311, which provides that the slips drawn from the box shall be preserved, and not returned to the box until all the slips shall be drawn out, such departure was not prejudicial to the defendant in a murder case, where subsequently and before he was brought to trial all the names were drawn from the box and again placed therein; the same jurors being secured for his trial as would have been secured had there been no irregularity. (Page 351.)

2. JURY—DRAWING AND RETURN—WAIVER OF OBJECTIONS. Where the impaneling of a jury in a murder trial exhausted the panel and the defendant accepted the jury without having exhausted his peremptory challenges, he waived any right to object to the manner of drawing and return of the jury.[1] (Page 351.)

3. HOMICIDE—JUSTIFICATION—SELF-DEFENSE. In view of Comp. Laws 1907, sec. 4168, providing that homicide is justifiable when committed in resisting an attempt to commit a felony or to do great bodily injury, or in any attempt to apprehend, by lawful means, any person who has committed a felony, one who, after remonstrating with another who was in the act of committing a robbery, went away, and armed himself, and returned and approached the robber with a gun in his hand, just as the robbery was being completed, and the person robbed forced to leave at the point of a gun, was justified in so doing, and the robber, having thereupon shot and killed him, was not entitled to claim self-defense, regardless of who fired the first shot. (Page 353.)

4. HOMICIDE — INSTRUCTIONS — SELF-DEFENSE — HARMLESS ERROR. Where there was no evidence to show that one on trial for murder shot in self-defense, an instruction that he would have been justified in killing the deceased under certain stated circumstances, unless the deceased was trying to prevent him from committing a felony, was prejudicial to the prosecution rather than to the defendant. (Page 354.)

---

[1] Connor v. Salt Lake City, 28 Utah, 259, 78 Pac. 481.

5. HOMICIDE—INSTRUCTIONS—PROOF OF JUSTIFICATION—HARMLESS ERROR. Where, in a murder trial, there was no evidence warranting an instruction as to self-defense, or tending to reduce the grade of the crime, or to justify or excuse it, the defendant was not prejudiced by an instruction that defendant having admitted the killing, and the testimony not showing clearly that the crime was only manslaughter, if anything, the burden of proving justification rested upon him, though perhaps abstractly erroneous and in conflict with an instruction given in the language of Comp. Laws 1907, sec. 4856, which provides that upon a trial for murder, the commission of a homicide by the defendant being proved, the burden of proving justification shall devolve upon him, unless the proof for the state tends to show that the crime committed amounts only to manslaughter, or that the defendant was justifiable or excusable. (Page 355.)

APPEAL from District Court, Fourth District; *Hon. J. E. Booth,* Judge.

Tabby W. White was convicted of murder in the first degree and he appeals.

AFFIRMED.

*Tos. W. O'Donnell, Hiram E. Booth,* and *Wm. M. McCrea* for appellant.

*A. R. Barnes,* Attorney-General, for the State.

STATEMENT OF FACTS.

Tabby W. White, an Indian to whom land has been allotted by the government of the United States, and residing in the county of Uintah, Utah, upon what was formerly the Uintah Indian reservation, is charged in the information filed by the district attorney with having "unlawfully, willfully, feloniously, and of his deliberately premeditated malice aforethought" killed and murdered one Belden N. Reynolds, a white person, at Moffat, Utah, on the 23d day of July, 1910. Upon a trial of the cause the defendant was found guilty of murder in the first degree "with a recommendation of the

jury," and was thereafter sentenced to imprisonment in the Utah state prison for the period of his natural life. To reverse the judgment the defendant presents this appeal.

The facts, briefly stated, are: On July 23, 1910, Reynolds (referred to occasionally by the witnesses as "Bob") was at his home a few miles from Moffat, Uintah County, Utah. At about six o'clock in the morning of that day the defendant came there and ate breakfast with Reynolds and his family. Between eight and nine o'clock de 'endant, in company with Reynolds, a man by the name of Bi llock, and Reynolds'. little boy, started for Moffat, the defendai t riding one of Reynolds' horses. The party had with them a jug of whisky which the defendant had brought with him to Reynolds' home that morning. On the road to Moffat defendant and Reynolds took three drinks each, and Bullock two drinks of this whisky. On their arrival at Moffat, Reynolds and the defendant went to what is known as Nichols' Store and remained in and about the place until some time between three and four o'clock in the afternoon, when the homicide in question occurred. One J. A. Wilson came to the store between two and three o'clock that same day. It appears from the record that Wilson some six months prior to this had borrowed some money from the defendant, and that there was some ill feeling on the part of defendant toward Wilson; the defendant claiming that there was a balance of thirty-four dollars due from Wilson on the loan which he claimed Wilson refused to pay.

Wilson was called as a witness by the state, and testified: That he and the defendant and Reynolds were in the store mentioned. That he left the store, remarking to Reynolds that he was going to feed his horses some grain. That, when he got a few feet from the store, "something attracted my attention. . . . I looked over my right shoulder, and saw Mr. White (defendant) with a revolver in his hand, pointing the revolver so as to be about at the butt of my ear. I turned, . . . and was facing him directly, and he changed the gun so it was pointed towards my breast, and then he says: 'I want your money.' I said: 'All right, Tabby, how much do you need?' He says: 'I want thirty-

five dollars,' or 'forty dollars,' I forget which, and I says: 'That's all right, Tabby, I don't know if I have that much, but will give you what I have.' I put my hand in my left-hand pocket and took out my purse. . . . I had $1.10 in silver, . . . a five dollar gold piece, and a five dollar bill, and took them out . . . and offered to hand him the money, and he said, 'No; lay it down on the rock.' The rock was right between us, right in front of me, so I could reach it without stepping from my position, and just as I started to stoop down I heard Reynold's voice, but didn't see him. He said: 'That's right, Mr. Wilson, treat the Injun right.' I said: 'Yes, Bob; I always aim to treat everybody right,' I went ahead and laid the money down and raised up and looked at Tabby, but didn't see Reynolds yet; and he said, 'Turn your back.' I turned, . . . and then started to walk off, and I think perhaps I had taken one or two steps when I heard Reynolds' voice again. He says: 'You don't want to shoot Wilson—Judge Wilson,' I think he said, 'he is our best friend.' And just about the time that sentence was completed I heard the first shot, and then there were three shots in succession, pretty near as quick as you could snap your fingers. I walked on, . . . and went into the store door, and then turned to the south again so I was looking out of the door, and I heard Mr. Donaldson say, 'There is a man killed here,' and he was dragging Reynolds out of the ditch."

Nora Caldwell, a witness for the state, testified in part as follows:

"I was in Moffat on the 23d day of July this year. Between three and four o'clock I was in my house, which is sixty feet east of Nichols' Store, facing south. I heard some one swear and call names from the outside of the house. I raised the blinds, and looked through the window in the west side of the house. From that window I could see the store—the front part of the store. I saw defendant and Mr. Wilson and Mr. Reynolds. I saw Mr. Wilson as he was taking a purse out of his pocket, and, when I looked at Mr. White, he had his six shooter in his hand, and was swinging it around, and he said, 'Put it on the rock quick,' and Mr. Wilson put

his money on the rock in front of him. Reynolds was there and told the defendant not to kill Mr. Wilson, that he was a good friend and nice man, and would give him the money. The defendant then said, if he did not go around the corner and do it quick, he would kill him. Reynolds then ran around the corner, and in a very short time Reynolds came around to the front of the store with a six shooter. Then he came to the corner, and the defendant shot at him. Mr. Reynolds' arm that was holding the pistol was by his side when the first shot was fired by the defendant. Then he ran up to him with his six shooter, and the shooting went on so fast I couldn't tell anything about it—who was doing the shooting. After that, I saw Mr. Reynolds run back and fall in the ditch."

Grace Johnson, who was also an eyewitness to the shooting, was called by the state, and testified that she was with Nora Caldwell at the time of the homicide. She further testified:

"I got up and went to the window, and Mr. White, Mr. Wilson, and Mr. Reynolds were all standing in front of the store. Wilson put his money on a rock, and Reynolds was talking to the defendant, and said not to kill him; that he was an honest man and would give him his money, and not to kill him. I heard defendant tell Mr. Reynolds to get around the corner or he would kill him. Reynolds went around the corner. . . . A short time after that I saw Reynolds when he came around the east corner at the front of the store. . . . Wilson had put his money on the rock. Reynolds had put a revolver in his right hand, carrying it at his side. His arm was hanging down. I noticed the defendant when Mr. Reynolds came to the corner. Defendant turned and fired at Mr. Reynolds. Reynolds then ran in on him, and fired and shot. I would say that the defendant fired the first shot at Mr. Reynolds. The other shots came immediately afterwards. . . . I saw him (Reynolds) fall, and saw him immediately after he was dead."

The defendant was sworn as a witness, and testified that soon after arriving at Moffat on the day in question he obtained a box of cartridges for his pistol; that "I had no cartridges for this pistol up to that time. . . . After I

got the cartridges, I got drunk, and I don't know what I did
do. I must have went up and laid down, I guess, and went
to sleep. I do not remember when I went to sleep. I re-
member being in Nichols' Store after that sitting on the coun-
ter, and I saw Reynolds when he came up to me. He called
me out, and he went out, and I followed him. . . . When
I went out, he turned to the left, and stopped right by the
window, . . . and said: 'Don't you want a drink?' I
said: 'Yes; I don't mind having a drink.' He said: 'Well,
come on.' And he started off and turned the corner. As
soon as I got here [indicating on a diagram of the premises
used at the trial] I saw Wilson, too; and I thought about the
money he had not paid me, and I pulled my gun out, and I
had it like this [indicating]. I said: 'Mr. Wilson, stop. I
want my money right now.' And he said: 'All right.' And
he backed right against the house. I said: 'I want my
money.' And he said: 'How much?' I said: 'You know
how much it is. It is $34.' He reached in his pocket and
was feeling around, and it seemed like he was kind of slow,
and I raised my gun up like that [indicating], and he said:
'Don't! Don't! Tabby, don't shoot me.' Then he finished
getting the money out, what he had. I don't know how much
he did get, and I just happened to see the rock there, and I
said: 'Put it down on that rock.' . . . After he put
the money down I said, 'Now, you can turn around and go;'
and he turned. Just as soon as I called on Wilson, he was
off kind of close to the wall, and Bob [deceased] was a little
to the right, and I was kind of behind him, and, as soon as
Wilson stopped, he [Reynolds] went around a little way and
turned around, and seemed as if he saw the gun, and he
turned right around me to the right, and went back into the
store, I guess. He went around the corner. I did not say
anything to him about going around the corner. My entire
conversation was with Wilson. I did not see Reynolds while
I had the conversation with Wilson. After Wilson put the
money on the rock, I picked it up. I took my gun in my
left hand and picked the money up with my right hand and
stuck it in my pocket, and, while I had my hand about like

this [indicating], I was shot through my neck, and, of course, I didn't know what. After I felt this shot, . . . I felt somebody behind me stick a gun under my right arm, and forced it under my arm. It forced my arm up, and, just as I looked, the gun went off, and I didn't know any more, I guess. I turned around and saw him off. I can't say just about how far, and I had the gun in my left hand, and I just used my left hand in cocking the gun when I shot and didn't raise it up. I shot from here three times before he fell." On cross-examination the defendant said: "He [Reynolds] shoved the gun under my arm and I looked like that [indicating] and saw him. He shot. I don't know what I did do after that. For a couple or three seconds I didn't know nothing. After he shot me under the arm, I turned in the same direction he was. He was off toward the corner of the house when I shot him. He got past me after he shot me and walked off. . . . I didn't know anything for a little bit until I saw him going the other way. He was northeast of me when I shot him. . . . I recognized him as soon as I saw him when I turned. I just had the gun in my left hand. I didn't take any aim. I held it down here [indicating], but had the gun pointed at him. . . . He must have been right about the corner of the store when I fired. I fired three shots at him. . . . He was not going directly toward me when I first shot. He passed the post when I fired the second shot. He must have been a little further off when I fired the third time. He had gone away from me after I fired the first shot." And he further testified: "I lay down in the bowery, just west of the store, and slept until just before I came into the store, and hadn't then had anything to drink after I woke up. I had somewhat of a 'jag' on before I went to sleep, and when I woke up, I felt the effects of the jag. I recognized the people that I saw, and I knew what I was doing when I came out with Reynolds, and he asked me if I wanted a drink, and I knew what I was doing when I met Wilson and asked him to give up that money and also when I fired at Bob. Q. You have been in the habit of using guns of this kind considerably, haven't you, Tabby? A. Yes, sir. Q. You are

quite an expert shot with one, aren't you? A. Yes, sir. Q. In fact, you can ride along on your horse and pick off the heads of prairie dogs quite easily, can't you? A. Yes, sir.

McCARTY, J. (after stating the facts as above).

Before the jurors were sworn, defendant interposed a challenge to the panel, alleging, as ground of challenge, that there had been "a material departure from the forms prescribed in respect to the drawing and return of said jury." The court overruled the challenge, to which ruling the defendant duly excepted.

It appears from the record that on May 28, 1910, the clerk, in pursuance of an order theretofore made by the court, drew the names of twenty-five persons from the jury box to serve as jurors during the June term of court, and issued a venire to the sheriff on May 31, 1910, which venire was made returnable on June 16, 1910. No return was made on the venire by the sheriff of Uintah County, nor by any one acting for him, and no jury cases were tried at the June, 1910, term of court. No further order was made by the court in reference to the venire or list of jurors so drawn, and the clerk thereafter returned the slips containing the names of the jurors so drawn into the jury box. On August 24, 1910, the clerk, pursuant to an order of the court, again drew the names of twenty-five persons from said box to serve as jurors at the September term. Nineteen of these names were the same as had previously been drawn in May. This panel was exhausted before a jury was secured to try this case, and the court ordered a special venire. Thereupon twenty-eight additional names were drawn from the box. The defendant challenged the twenty-eight jurors comprising the special venire on the same grounds alleged in his challenge to the general panel. This challenge was also denied by the court. The contention made on behalf of defendant is that he was entitled to have a jury selected from "a list of names drawn at the term of court at which he was tried, and from a list which contained no names that had been drawn out of the box prior

thereto," and that the method followed by the clerk in drawing the jurors comprising the panel challenged was a substantial departure from the procedure prescribed by Comp. Laws 1907, sections 1310, 1311. Section 1310 provides, so far as material here, that "the clerk . . . shall draw from the jury box such number of names to serve as petit jurors . . . as the judge may verbally, by letter, or by telegram direct." Section 1311, among other things, provides that "the clerk of the court shall issue a venire to the sheriff or his deputy directing him to summon the persons so drawn. The slips so drawn from the box shall be preserved, but shall not be returned to nor again placed therein until the balance of the slips therein shall have been drawn out; provided, that if, during the year, all of the slips shall have been drawn from the box, they must be again placed therein, and the same procedure had as hereinbefore provided." The record of the proceedings had with respect to the drawing of slips from the jury box before this case was called for trial is not as full and complete as it should be. It appears, however, from the fragmentary parts of these proceedings contained in the bill of exceptions that subsequent to the irregularity complained of the slips were all drawn from the box, and again placed therein before this case came on for trial. At the time the challenge to the panel was interposed, the court, in denying the challenge, remarked:

"There seems to have been a technical noncompliance with the law. When the jurors' names are drawn out of the box, they properly ought to be held out of the box until the box is exhausted. In this case, in June, when I ordered the jury, I believe I wrote a letter to the clerk explaining at that time that, if there was no jury work to be done, he need not go to the expense of having them served and brought here. He found there was no jury work, and the names were then put back in the box. However, the box has been exhausted since then and before this trial was commenced, and I think the difference is not prejudicial to the defendant, as all the names had to go back in the box anyway."

Appellant has incorporated these remarks of the court in his printed abstract as representing the true state of the record as made in the lower court.

Counsel for appellant, in the discussion of this feature of the case, in their printed brief, concede "that where jurors finally drawn are the same ones as would have been drawn, or are selected from the list that they would have been selected from if the law had been strictly complied with, there is no error." Such seems, in effect, to be the case before us. The slips containing the names of jurors in the box having all been drawn out in trials taking place at the September term—the term at which the defendant was tried and convicted—such slips were returned therein, and among them were the slips which had been drawn out in June preceding. It was therefore immaterial, so far as it affected the rights of defendant, whether the slips containing names drawn in June were returned to the box before the commencement of the trial had at the September term or were withheld therefrom until all the names then in the box had been drawn out and then returned with the other slips to the box. While the act of the clerk in returning to the box the names of the jurors drawn for the preceding May term of court before all names had been drawn therefrom was irregular, yet it could not in any way have prejudiced the rights of the defendant. In fact, no claim is made that this irregularity prevented, or tended in the remotest degree to prevent, the defendant from securing a fair and impartial jury composed of men competent and eligible to serve as jurors.

Furthermore, the impaneling of a jury in this case exhausted the panel of twenty-eight jurors challenged by the defendant, and, when he accepted the jury, he had exercised but nine of the fifteen peremptory challenges allowed him by law, from which it may be fairly inferred that the defendant considered the jurors comprising the trial panel fair and impartial, and that he was willing to submit the issues of fact in the case to them. In the case of *Connor v. Salt Lake City*, 28 Utah 259, 78 Pac. 481, this court, speaking through Mr. Justice Bartch, said:

"The parties to every case at law may demand a fair and im-
partial jury to be selected from the panel of jurors drawn for
service in the court where the case is to be tried, but whether
such jury be selected from the entire panel or only a portion
thereof is immaterial.    If the jurors constituting the jury are
competent, fair, and impartial, it is all that the law requires and
the litigants can demand."

Questions involving this same principle are discussed in the
following cases, which uphold the rule here announced: *State
v. Hensley,* 94 N. C. 1027; *Niles v. Circuit Judge,* 102 Mich.
328, 60 N. W. 771; *State v. Tighe,* 27 Mont. 327, 71 Pac. 3.

The defendant attempted to justify the killing of Reynolds
upon the ground of self-defense, and the court charged the
jury somewhat elaborately upon the theory of self-defense.
Two of the six separate and distinct paragraphs of the instruc-
tions given by the court on this question were excepted to by
the defendant, and are assigned as error.    The portions of
the charge relating to self-defense excepted to are as follows:

"No. 13.    The defendant admits the killing but claims
justification for his act upon the theory of self-defense, and
this defense is a just and valid one, if sufficiently proved.
However, the defendant having admitted the killing, and the
testimony not showing clearly that the crime is only man-
slaughter, if anything, the burden of proving said justification
rests on the defendant."

"No. 17.    If it appears to your satisfaction as jurors that
the defendant herein was assaulted by Reynolds without any
wrong or cause on the part of the accused against the said de-
ceased, and that at the time Reynolds appeared around the
corner of Nichols' Store with a gun in his hand, and this
defendant at that time honestly and truly believed that he
was in imminent danger of his life or great bodily harm, he
would be justified in taking the life of said deceased, Rey-
nolds, *unless you find that the deceased was trying to prevent
the defendant from committing a felony.*"

We shall first consider the assignment of error directed at
instruction No. 17.    This instruction, except the italicized
part, was given at the request of the defendant.    His counsel
in their printed brief contend "that the transaction be-

tween the defendant and Wilson was fully completed; that Wilson had departed from the scene before the deceased, Reynolds, appeared upon the scene with the revolver. In other words, we believe the evidence discloses the fact to be that the felony, if it was a felony, committed by the defendant upon Wilson, had been completed at the time of the intervention of Reynolds." Hence the giving of the italicized part of the instruction was error. Counsel do not expressly, but they do inferentially, claim that there is some evidence from which the jury might infer that Reynolds was the aggressor, and that, therefore, defendant was entitled to have his requested instruction given without modification. We have carefully examined the record, and we fail to find any evidence whatever upon which an instruction on the right of self-defense could properly be predicated. According to defendant's own testimony, Reynolds was with him when he pulled his gun on Wilson, and he knew that Reynolds at the time was fully advised of what he was doing, namely, acting in the role of a highwayman and robber, and that he was committing a felony. The defendant in his testimony says:

"Just as soon as I called on Wilson, he was off kind of close to the wall, and Bob [the deceased] was a little to the right, and I was kind of behind him, and, as soon as Wilson stopped, he [Reynolds] went around a little way and turned around and seemed as if he saw the gun, and he turned right around me to the right, and went back into the store, I guess. He went around the corner."

When Reynolds returned with the revolver, the defendant had taken Wilson's money, and was in the act of putting it in his pocket, but he still had the revolver in his hand, and was in the act of forcing Wilson to leave the place where he had just been compelled to deposit the money, and was prepared to shoot him in case he refused to go. In other words, defendant's own evidence shows that what he did there in regard to Wilson was one continuous transaction. Under the admitted facts in this case, it is wholly immaterial whether the robbery was or was not a completed and past transaction when Reynolds returned to the scene with his gun. As we have

40 Utah—23

pointed out, the evidence of the defendant shows that he had committed a felony, or was in the very act of committing one, when the shooting in question took place. Comp. Laws 1907, section 4168, provides, so far as material here, that homicide is justifiable "when committed by any person in either of the following cases: (1) When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; . . . (5) when necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace." It is only fair to counsel for defendant to say that they concede "that the deceased, Reynolds, would have had a right to attempt by lawful ways and means to apprehend any person for a felony committed." While counsel seem to inferentially claim that Reynolds failed to bring himself within the statute when he interfered with defendant upon the occasion in question, they have not pointed out, nor attempted to point out, wherein the "ways and means" adopted by him were in any sense unlawful. The uncontradicted evidence shows that, when he first observed the defendant in the act of committing a felony, he remonstrated, and said to him: "You don't want to shoot Wilson. He is our best friend." He then adopted the only effective means at his command. He went and armed himself, and returned to where the defendant was just completing his crime of robbing Wilson, and, even if it were conceded that he fired the first shot, he did not, under the circumstances, use any more force than he was warranted in doing. And there is not a fact or circumstance testified to by the defendant or any witness in the case that warranted the court in instructing the jury at all upon the question of self-defense.

It therefore necessarily follows that, while the instruction complained of might have been prejudicial to the interests of the state, it could not upon any logical theory of the case have been prejudicial to the rights of the defendant because the court in submitting this question to the jury gave the defendant more than he was entitled to.

The defendant assails instruction No. 13 on the ground that it is erroneous, and in conflict with the court's instruction No. 6. Instruction No. 6 is in the language of Comp. Laws 1907, section 4856, which provides that "upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, shall devolve upon him, unless the proof on the part of the prosecution tends to show that the crime committed amounts only to manslaughter, or that the defendant was justifiable or excusable." If there were any facts in the case upon which an instruction on the theory of self-defense could properly be given, there would be much force to the contention that instruction No. 13 was erroneous, and that the giving of it was prejudicial error. But, as we have pointed out, there was no evidence introduced, either on the part of the state or the defendant, that in any way "tends to show that the crime amounted only to manslaughter, or that the defendant was justifiable or excusable." Therefore the giving of the instruction could not, upon any logical theory, have prejudiced the rights of the defendant. We think the instructions as a whole were more favorable to the defendant than the facts warranted.

There are other errors assigned, but, viewing the case as we do, we do not deem them of sufficient importance to justify further discussion.

We find no reversible error in the record. The judgment is therefore affirmed.

FRICK, C. J., concurs. STRAUP, J., concurs in the result.