STATE of Utah, Plaintiff and Respondent,

v.

Gerald Paul BROWN, Defendant and Appellant.

No. 15481.

Supreme Court of Utah.

Feb. 7, 1980.

Gary D. Stott and Gary J. Anderson of Stott, Young & Wilson, Provo, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Craig L. Barlow, Asst. Atty. Gen., Salt Lake City, Noall T. Wootton, Utah County Atty., Provo, for plaintiff and respondent.

WILKINS, Justice:

Defendant was charged with one count of first degree murder in violation of Section 76–5–202(1)(h),[1] the criminal information alleging defendant killed one Steven Losh on April 12, 1977, for the purpose of preventing the said Steven Losh from appearing as a witness against him in a pending trial in the District Court of Utah County in which defendant was charged with second degree murder. Defendant was tried on the first degree murder charge in a bifurcated hearing pursuant to Section 76–3–207[2] before the District Court, Duchesne County, sitting with a jury of twelve members, which returned a unanimous verdict of guilty of first degree murder, and, after the hearing on the penalty, returned a unanimous verdict of death. From judgment entered on the verdicts, and the Court's sentence of death by firing squad, defendant appeals.

The evidence at the guilt-determining phase of the trial showed that Steven Losh had been served a subpoena to appear as a witness on behalf of the State of Utah in a trial scheduled for April 13, 1977, in which, as noted, defendant had been charged with second degree murder in Utah County. One Lou Ann Ross was also named as a witness in the subpoena, but had not been served. To insure that Lou Ann Ross would not be served with the subpoena, defendant had taken her to a house trailer located in Red Creek, a wilderness area in

---

1. All statutory references are to Utah Code Ann. 1953, as amended, unless otherwise specifically indicated. Section 76–5–202(1)(h) provides pertinently:

   (1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:

   \* \* \* \* \* \*

   (h) the homicide was committed for the purpose of preventing a witness from testifying, or a person from providing evidence, or a person from participating in any legal proceedings or official investigation.

2. Section 76–3–207 provides for a bifurcated trial consisting of a guilt or innocence phase separate from the penalty phase only in first degree murder cases. Hence references herein to the guilt or penalty phases are to the Duchesne County trial only.

Duchesne County, Utah. Steven Losh had also agreed not to testify, and to stay at the trailer until the trial in Utah County against defendant was over. On April 12, 1977, Buddy Kummer, a friend of defendant drove defendant and Steven Losh in Kummer's truck from American Fork, Utah, to the Red Creek area. According to Kummer's testimony, the three men consumed approximately two cases of beer along the way. In addition, defendant was taking Preludin, an amphetamine, or "upper," and was also drinking whiskey, and Steven Losh was taking Preludin and Valium, a tranquilizer, or "downer". At some point along the way, Losh asked defendant for more Valium which the defendant refused to give him, as, he said, he needed it for his trial the next day. This caused Losh to become angry, and to "rub the defendant, in a way". Specifically, Kummer testified that Losh had told defendant that he, Losh, could do six months in the county jail for contempt of court standing on his head, but that the defendant was going to spend ten years in the state prison. Losh asked defendant if he would be a "punk" for one of the inmates. When the truck arrived at the trailer in Red Creek where Lou Ann Ross and one Michael O'Neill were staying, the three men departed from the truck. Kummer testified that the events happened in the following manner:

Kummer went to the back of the trailer to empty his bladder, while Losh went to the front of the trailer, presumably for the same purpose. Kummer turned around, and bumped into defendant already coming out of the trailer. Defendant said something to Kummer about a hole. Defendant ran over to the truck and took Kummer's gun out of the "jockey box". Kummer thought he was coming at him, and ran into the trailer, telling O'Neill, who was just getting dressed, to stay in the trailer because, "something's coming down". He heard two shots, Losh yelling, "Don't, Paul, don't," and also heard Losh's footsteps as he ran around the trailer. Two more shots were fired, a pause, then another shot. Kummer looked out of the window and saw Losh lying on the ground, on his right side,

and defendant bending over him with the gun in his hand. Defendant came into the trailer and said, "Come on, Bud, we've got a grave to dig." Kummer went with defendant to an area behind a sagebrush where the two of them began digging a hole. As they were digging, defendant asked, "How fast can Lou Ann run?" and "Are there any more shells?" When Kummer said there were no more shells for the gun, defendant said "It's just as well, then, this way." Before the grave was finished, defendant went back to the trailer, and O'Neill came out and helped Kummer finish digging the grave. Then all three men helped to carry and drag Losh's body to the grave and cover it with earth, rocks and dead wood. When they went back to the trailer, Lou Ann Ross was cooking hamburgers, and defendant sat down and ate.

The testimony of Lou Ann Ross and Michael O'Neill did not differ substantially from Kummer's. Lou Ann Ross also testified that she had heard Losh yell, while he was running around the trailer, "No, Paul, don't, I am with you," and that defendant had commented, during the time he was eating hamburgers, "He was a hard dying mother f_____," and had asked Lou Ann Ross to go into the trailer with him because "nothing makes me hornier than killing a man."

The body of Steven Losh was not found by police for a month. On May 23, 1977, the State Medical Examiner, Doctor Serge Moore, performed an autopsy on the body. He testified that there were three gunshot wounds on the body, but because of the state of decay he could not tell at what range the shots were fired. One wound was in the base of the left thumb where a piece of schrapnel was found. The second bullet entered the decedent's body from the back, just above the collar bone, and was found lodged at the base of the skull. The third bullet, which the Doctor described as the cause of death, entered Losh's body through the left temple, just above and behind the ear, and was found in the right side of the decedent's brain.

The body was determined to be that of Steven Losh with the aid of his dental records.

Defendant testified in his own behalf. His testimony was that when he went into the trailer, he saw through the windows that Losh had picked up a piece of firewood, which defendant described as a club; that he was apprehensive that Losh would try to harm him; that he had taken the gun to defend himself; that when he accosted Losh with the weapon Losh took a step toward him but he did not raise the club; that defendant had then blacked out and remembered nothing until he was standing over Losh with the gun in his hand. Defendant also testified that he had been found guilty of the second degree murder in the previous trial, without the testimony of Losh and Ross.

Doctor Carl R. Peterson, a psychiatrist, testified that he had examined defendant and that he had formed an opinion, noted infra, which was based on the following elements: (1) that defendant had had no sleep for four or five days, during which time he had taken Preludin, Valium, and whiskey; (2) the great amount of whiskey, beer and Preludin alleged to have been consumed by defendant during the day of April 12, 1977; (3) defendant's history of stuttering as a child, and his inability to express his emotions adequately; and (4) the pressures of his upcoming trial for second degree murder. The doctor expressed an opinion that defendant was in what he termed "rage reaction" at the time of the killing and could not have formed the requisite intent to kill Losh for the purpose of preventing him from testifying.

During the penalty phase of the trial, the State introduced evidence that defendant had been convicted in the past of burglary, forgery and auto theft for which he had spent a total of ten of his adult years in prison, and had first been in trouble with the law at the age of fourteen. Wayne Watson, Utah County prosecutor, related the evidence presented in the Utah County trial of defendant on the charge of second degree murder. He testified that the testimony had shown the following facts:

That on August 27, 1976, Samuel Bingham had picked up Steven Losh and defendant in his car outside the Caravan Lounge in American Fork, Utah. Steven Losh was bleeding from his ear, and the three decided to find the "guys that had beat up on Steve." They eventually found a parked white pickup truck in which Sonny Cordova and Julian Cole were sitting. Bingham testified that he, Losh, and defendant got out of the car; that Bingham walked toward the driver's seat of the truck, but that he saw defendant behind him and saw that he had a gun. Bingham went back to his car. Defendant went up to the driver's seat of the truck and shot Sonny Cordova once through the head, and then shot Julian Cole, who had thrown up his arm to defend himself. Sonny Cordova died as a result of the gunshot wound; Julian Cole lived.

Janet Bezzant, Kummer's girlfriend, also testified during the penalty hearing that defendant had stated to her on the morning of April 13, 1977, that after Losh fell down, defendant had put the gun to his head and fired.

Defendant introduced the following evidence at the penalty hearing:

A written psychiatric evaluation by Doctor Carl R. Peterson, in essence paralleling his oral testimony, described *ante*; testimony of Guy Moore, a friend of the defendant, who testified that he had never seen defendant commit an act of violence, and that it was his opinion that defendant was incapable of a premeditated murder; testimony of Phyllis Wilson Brown, defendant's ex-wife, who testified that defendant was a good influence on her two children of a previous marriage and on a child of their marriage; and defendant's testimony, asking for life imprisonment rather than death, so that he could visit his children, and raise them as best he could under the circumstances. Defendant was 34 years old at the time of this trial.

■ Defendant cites, as prejudicial error, the Court's failure to include in its voir dire of the jury panel, a question as to the

veniremen's beliefs on the death penalty. It is noted that neither the State nor the defendant requested such an inquiry, and no objection was made to the omission. Nevertheless, as this is a capital case, we consider the defendant's contention on appeal.[3] Though defendant does not cite the case of *Witherspoon v. United States*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) we, sua sponte, pursue an analysis of it. There the Supreme Court held that:

[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced *general objections* to the death penalty or expressed conscientious or religious scruples against its infliction. [Emphasis in original]

But, the Court in *Witherspoon* also stated that nothing precludes a state from excluding, for cause, prospective jurors from serving whose objections to the death penalty would *preclude* them from finding a defendant guilty of a capital crime. Of course, *Witherspoon* acknowledges that general objections and scruples against the death penalty do not by themselves necessarily preclude a juror from finding guilt in a proper case.

Here, no prospective jurors were excluded because their objections to the death penalty precluded their finding of guilt regardless of "the facts and circumstances which might emerge in the course of proceedings."[4] As no inquiry was made by the Court, certainly no jurors were excluded on the ground that they might be prejudiced in favor of the defendant, and we fail to perceive how defendant could be prejudiced by the omission of such a *Witherspoon* inquiry.

Defendant does cite *State v. Belwood*, 27 Utah 2d 214, 494 P.2d 519 (1972) as supportive of his position that the Court's failure to inquire of the panel as to their beliefs on the death penalty violated his constitutional rights.

The Court asked each juror the following question:

Do you have any reason to believe you can't listen to the evidence here in court and the law as I give it to you and based solely on that evidence and that law and nothing else render a fair and just verdict as between the parties.

Any implications that the jurors must render a verdict of death in every case in which a verdict of guilt is determined, as was the impression found to have been made by the District Court's inquiry in *Belwood*, are certainly not present here. We conclude *Belwood* therefore is no authority for defendant's point.

Defendant presented two theories in his defense. First, that his consumption of enormous amounts of drugs and alcohol precluded him from being capable of forming any requisite intent to commit the crime. Defendant presented the expert testimony of Doctor Peterson, as noted earlier, to support this theory. Secondly, defendant requested four instructions on the law of self-defense, which the Court refused. Defendant argues that the Court erred in refusing to give these instructions.

■ Defendant is entitled to have the jury instructed on his theory of the crime if there is any basis in the evidence to support that theory. In *State v. Castillo*, 23 Utah 2d 70, 457 P.2d 618 (1969), this Court drew the guidelines in this area:

If the defendant's evidence, although in material conflict with the State's proof, be such that the jury may entertain a reasonable doubt as to whether or not he acted in self-defense, he is entitled to have the jury instructed fully and clearly on the law of self-defense. Conversely, if all reasonable men must conclude that the evidence is so slight as to be incapable of raising a reasonable doubt

---

3. *State v. Stenback*, 78 Utah 350, 2 P.2d 1050 (1931).

4. *Witherspoon*, 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21. See also our statute governing challenges for implied bias, § 77-30-19(9) and

*State v. Belwood*, 27 Utah 2d 214, 494 P.2d 519 (1972); and *State v. Codianna*, Utah, 573 P.2d 343 (1977), in which cases *Witherspoon* is discussed.

in the jury's mind as to whether a defendant accused of a crime acted in self-defense, tendered instructions thereon are properly refused. [457 P.2d at 620]

The law of self. defense is governed by Section 76–2–402, which provides in pertinent part:

(1) A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such force is necessary to defend himself or a third person against such other's imminent use of unlawful force; however, a person is *justified in using force which is intended or likely to cause death or serious bodily injury only if he reasonably believes that the force is necessary to prevent death or serious bodily injury to himself* or a third person, or to prevent the commission of a forcible felony. [Emphasis added.]

We find no credible evidence that defendant might have been justified in using deadly force to protect himself or that he reasonably believed himself to be in danger. His testimony was that he was inside the trailer when he saw Losh pick up a club. If this were true, he would only have had to stay in the trailer to prevent Losh from harming him, even if he believed he was in danger. He also testified that Losh had not threatened him with the club. His testimony on cross-examination was:

A  Well, as I came around the corner Steve turned and started towards me.

Q  With a half step?

A  Yes.

Q  Did he say anything?

A  No, he never.

Q  Did he raise the club?

A  Not that I recall.

Q  Did you hit him with that shot?

A  I don't believe so.

Q  Then what did he do?

A  The best I can remember he run.

■  There is no evidence capable of raising a reasonable doubt in the jury's mind as to whether the defendant acted in self-defense; on the contrary, the evidence unmistakably shows instead that defendant was the aggressor. The instructions covering the law of self-defense were therefore properly refused.

■  Defendant contends that the Court erred in admitting a film of the premises where the killing took place, and allowing it to be viewed by the jury. Defendant argues that the film was prejudicial to defendant, and he describes it as an attempt to reenact the crime, in front of the jury, with the "cameraman" trying to simulate the actions of the defendant. The transcript shows that the Court admitted the film for illustrative purposes only, and as an alternative to a viewing by the jury of the area in Red Creek. Under Rule 45, Utah Rules of Evidence, the admission of evidence is within the discretion of the District Court. We have reviewed the film and find that it is not in any manner an attempt to reenact the crime. It is merely a film of the area, where the killing occurred, including the trailer, the sagebrush, and a hole in the ground, none of which was at all inflammatory or prejudicial to defendant. There is no basis for defendant's argument that the Court abused its discretion in allowing the jury to view the film.

Defendant also argues that the evidence does not support the jury's verdict that defendant killed Steven Losh for the purpose of preventing him from testifying.

Defendant asserts that Losh would not have been a competent witness in defendant's second degree murder trial, because on the night defendant killed Sonny Cordova, Losh was intoxicated on alcohol and drugs and could not report what happened. And to illustrate this point, defendant contends that portions of Losh's testimony at the preliminary hearing in that matter, which the Court refused to admit in the instant case, would show that Losh remembered nothing of the events of that night.

We believe that the Legislature, in defining and categorizing the killing of a witness by another as first degree murder, recognized that such a killing is a particularly heinous and serious crime because it attacks the very heart of our system of justice. We

do not believe that it was within the intent of the Legislature that the State be required to prove that the witness was a competent witness. To so hold would emasculate the statute, for until a witness is called to testify, it may not be known whether he is competent or not.

The evidence at the trial for second degree murder shows that Losh was present when defendant shot Sonny Cordova. Losh therefore knew, or it was reasonably believed that he knew, material facts pertaining to that charge, and hence, he had been subpoenaed to testify concerning those facts. Regardless of what the transcript of the preliminary hearing showed in the Cordova matter, the Court did not err in excluding that evidence here as it was immaterial for reasons just noted.

But defendant persists that *he knew* that Losh remembered nothing of the events concerning Cordova that night; that defendant *did not fear* Losh's testimony; and that further, the evidence as a whole is insufficient to support an element of the crime in this present case. In sum, defendant argues that he did not kill Losh for the *purpose* of preventing him from testifying, but that he was simply in a rage because Losh had called him names.

Defendant's intent, or purpose, is a fact for the determination of the jury. In order to set aside a jury verdict, the evidence must appear so inconclusive or unsatisfactory that reasonable minds acting fairly upon it must have entertained a reasonable doubt that the defendant committed the crime.[5]

We do not find the evidence in this case to be of such quality that reasonable minds must have entertained a reasonable doubt as to defendant's guilt. Several statements attributed to defendant show that defendant feared that Losh would testify against him, and that it was in fact his purpose to kill him to prevent that testimony. Janet Bezzant testified that defendant told her he had killed Losh to keep him quiet. The statements made by defendant to Kummer shortly after the killing of Losh, noted *ante*, are probative of demonstrating that the killing was for this purpose. But more importantly, defendant admitted that it was his intent to secrete Losh in Red Creek for the purpose of preventing his testimony. The jury could therefore find, as it did, beyond a reasonable doubt, from all the evidence which was substantial and credible, and the fair inferences from that evidence [6] that the killing of Losh was performed for the purpose of presenting Losh's testimony.

Defendant also contends that the Utah death penalty statutes are unconstitutional and do not meet the requirements of *Furman v. Georgia*,[7] *Gregg v. Georgia*,[8] *Proffitt v. Florida*,[9] and *Jurek v. Texas*,[10] on the theory that our statutes do not suitably direct and limit the discretion of the sentencing body so as to minimize the risk of wholly arbitrary and capricious action on the part of the jury.

Recently this Court in the case of *State v. Pierre*, Utah, 572 P.2d 1338 (1977),[11] meas-

5. *State v. Jones*, Utah, 554 P.2d 1321 (1976) at 1322. See also, *State v. Sullivan*, 6 Utah 2d 110, 307 P.2d 212 (1957); *State v. Danks*, 10 Utah 2d 162, 350 P.2d 146 (1960); *State v. Allgood*, 28 Utah 2d 119, 499 P.2d 269 (1972).

6. That this Court views the evidence and all reasonable inferences which may be drawn therefrom in the light most favorable to the jury's verdict, see *State v. Helm*, Utah, 563 P.2d 794 (1977); *State v. Jones*, Utah, 554 P.2d 1321 (1976); *State v. Sinclair*, 15 Utah 2d 162, 389 P.2d 465 (1964).

7. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

8. 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

9. 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

10. 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

11. *Cert. denied*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978). See also, *State v. Andrews*, Utah, 574 P.2d 709 (1977) *cert. denied*, 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 194 (1978); and *State v. Codianna*, Utah, 573 P.2d 343 (1977) *cert. denied* to *Codianna, Marvell and Dunsdon*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

ured the Utah statutes against constitutional requirements as enunciated by the U. S. Supreme Court in these four cases. We there held that the Utah legal system meets the constitutional tests of the U. S. Supreme Court cases cited above, because ". . . it is structured to provide reasonably that the unique and irretrievable sanction of death will be mandated by its provisions and processes only in extreme and unusually serious and shocking crimes." [572 P.2d at 1356.] And further, Section 76–3–206(2), which provides for automatic and mandatory review of all cases in which the death penalty is imposed, together with our rule that in capital cases this Court, sua sponte, considers manifest and prejudicial error though such error may neither be assigned nor argued,[12] combine to provide for a comprehensive review of the entire case, including the sentence of death, to determine if that sentence resulted from prejudice or arbitrary action or was disproportionate and excessive in relation to the offense for which defendant was convicted.

But defendant specifically asserts that where (1) the jury is not required to articulate its justification for the imposition of the death penalty by means of specific findings thereon which the appellate court could then review, and (2) the jury is not entirely bound to base the penalty on those aggravating circumstances promulgated by the Legislature, (for under Section 76–3–207[13] the jury may consider any aggravating factor which the District Court, in its discretion, finds to have probative value) and (3) the introduction of such aggravating factors is not governed by the exclusionary rules of evidence,[14] then the jury has unlimited discretion in imposing the death penalty, which was the very evil condemned by the U. S. Supreme Court in *Furman.* Further, defendant argues, even

automatic appellate review does not vitiate the possibility of arbitrary and capricious action on the part of an aberrant jury since the reviewing court must speculate about the bases on which the jury made its determination.

■ Concerning (1) of the preceding paragraph, this Court in *Pierre, ante,* specifically stated:

In Utah, the burden being on the state to convince the jury that the death penalty is appropriate by proof of total aggravation outweighing total mitigation, though written findings are not required, the basic concern mentioned by Mr. Justice Stewart in *Gregg,* at 428 U.S. 189, 96 S.Ct. 2932, "to minimize the risk of wholly arbitrary and capricious action" is more fully satisfied with respect to a standard of proof, we submit, than those standards approved in *Gregg* and *Jurek*; and particularly when the standard of proof beyond a reasonable doubt obtains in the guilt phase in Utah to find the crime of murder of which aggravating circumstances are a part. [572 P.2d at 1348.]

We consider these comments dispositive of defendant's argument on this point.

We now discuss the other points just mentioned. We believe the primary concerns of defendant can be centralized in his contention that hearsay evidence in the penalty phase was allowed (though no objection was made thereto) attributing to defendant inaccurate and prejudicial comments about the killing of Sonny Cordova at the Utah County trial where defendant was convicted of second degree murder, which inflamed the jury here. Specifically, Wayne Watson, a deputy Utah County attorney, testified at the penalty phase in this present case that one Samuel Bingham, an eye witness to the Sonny Cordova murder,

---

**12.** See *State v. Stenback, supra,* Note 3.

**13.** Section 76–3–207 provides in pertinent part:
(1) [I]n these proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including, but not limited to the nature and circumstances of the crime, the defendant's character, background, history,

mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence.

**14.** *Id.*

testified in that trial that defendant had said within Bingham's hearing: "I just head-shot two f_____ for messing with my brother". In fact, defendant contends that Bingham said in quoting defendant: "Something to the effect of: 'I shot them both in the head,' or, 'I head-shot both of them,' or something to that effect". Defendant is correct in this contention as revealed by a transcript of Bingham's testimony made for purposes of this appeal. That transcript was not available nor requested at the penalty phase, and as noted, no objection to this testimony was entered there. We consider this matter and all of its implications, however, even though no error was assigned below, because this is a case involving an imposition of the death penalty and our consideration is required in order to make a meaningful review.

■ Before addressing this matter fully we shall dispose of a portion of it now— namely, defendant's contention that Section 76-3-207(1) is unconstitutional because it allows a relaxation of the standards of the rules of evidence by allowing evidence to be admitted regardless of the exclusionary rules. We think not, because the drafters of the Model Penal Code (which our Legislature considered in drafting our Criminal Code in 1973) considered this problem and concluded:

> If a unitary procedure is used the determination of the punishment must be based on less than all the evidence that has a bearing on that issue, such for example, as a previous criminal record of the accused, or evidence must be admitted on the ground that it is relevant to sentence, though it would be excluded as irrelevant or prejudicial with respect to guilt or innocence alone. Trial lawyers understandably have little confidence in a solution that admits evidence and trusts to an instruction to the jury that it should be considered only in determining the penalty and disregarded in assessing guilt.
> [T]he obvious solution . . . is to bifurcate the proceeding, abiding strictly by the rules of evidence until and unless

there is a conviction, but once guilt has been determined opening the record to the further information that is relevant to sentence. [A.L.I. Model Penal Code, § 201.6, Comment 5, pp. 74–75 (Tent. Draft No. 9, 1959).]

The United States Supreme Court also observed in *Gregg*:

> Jury sentencing has been considered desirable in capital cases in order to "maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" [428 U.S. at 190, 96 S.Ct. at 2933, quoting *Witherspoon, supra*, which quoted *Trop v. Dulles*, 356 U.S. 86 at 101, 78 S.Ct. 590, 2 L.Ed.2d 630.]

\* \* \* \* \* \*

> When a human life is at stake and when the jury *must have information prejudicial to the question of guilt but relevant to the question of penalty*, in order to impose a rational sentence a *bifurcated system* is more likely to ensure elimination of the constitutional deficiencies identified in *Furman*. [428 U.S. at 191– 192, 96 S.Ct. at 2934. Emphasis added.]

\* \* \* \* \* \*

> [S]o long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision. [428 U.S. at 203–04, 96 S.Ct. at 2939. Emphasis added.]

So, we do not agree with defendant that Section 76-3-207(1) is constitutionally infirm, *per se*, because it does not necessarily require application of the exclusionary rules of evidence.

■ But, let us return to the larger aspect of the matter in this case; viz., was Watson's inaccurate testimony prejudicial error in the penalty phase? We conclude that it was and particularly when this error

is considered together with the failure to instruct on burden of proof discussed *infra.*

Focusing on this inaccurate testimony being prejudicial, we note the colloquy that transpired in the District Court as revealed by the record:

The Court: "Mr. Watson, you are an attorney. You know what hearsay upon hearsay is, do you?"

Watson: "Yes, Sir."

The Court: "I will ask you—under the law hearsay evidence is admissible, but I will ask you not to go into hearsay upon hearsay. The probative value of that becomes quite tenuous, Mr. Wooton."

Mr. Wooton, the prosecutor, responded that he understood. Thereafter the prosecutor asked Mr. Watson: "Tell us what Mr. Bingham testified to as far as that conversation was concerned."

Watson responded: "Mr. Bingham testified to my recollection that he was present when Mr. Brown encountered Lou Ann Ross. Mr. Brown stated to her, 'I just headshot two f_____ for messing with my brother.'"

Upon cross-examination of Mr. Watson by defense counsel the following exchange occurred:

Q. "Now you were admonished by the court not to relate hearsay on hearsay."

A. "Yes."

Q. "Before you testified you consulted with Mr. Wooton with regard to that testimony, didn't you?"

A. "Yes, Sir."

Q. "Then after that consultation you proceeded to tell the jury that which you have told them?"

A. "I did, sir."

Q. "If the record reflects to the contrary, would it not, Mr. Watson, as an attorney—that is, if the record in that other proceeding reflected Mr. Bingham

did not testify that—to that, then would it not be in fact hearsay upon hearsay?"

A. "Yes sir, it would."

Whether the testimony of Watson was accurate or not, it was hearsay on admissible hearsay. The testimony of Bingham at the prior trial was hearsay but admissible under an exception to the hearsay rule as an admission. See Rule 63(6) Utah Rules of Evidence. In the instant case, though, the District Court significantly ruled that hearsay on hearsay would not be admissible *because of its lack of probative value.* The prosecutor and his attorney-witness, however, did not honor this ruling.

We also consider a matter alluded to *ante,* not raised below nor on appeal but discovered by this Court's review, relating to failure by the District Court to give an instruction on the burden of proof necessary for a verdict of death in the penalty phase. In *State v. Pierre, ante,* at 572 P.2d 1347–48, this Court stated:

We hold that in the *penalty* phase of capital offenses the burden of proof necessary for a verdict of death over life imprisonment is on the State and that the totality of evidence of aggravating circumstances must therefore outweigh the totality of mitigating circumstances. [Emphasis in original.] [15]

We hold failure to instruct that the State in this case sustained the burden of proof in the penalty phase was prejudicial error. Without that instruction, the jury was not suitably directed on a most basic matter required by *Pierre,* and hence the standard required therein in cases involving "the unique and irretrievable sanction of death" that the "risk of discrimination, arbitrariness, caprice, and irrationality [should be] reduced to a minimum" was not met. [572 P.2d at 1356.]

15. We note that trial in this case commenced on September 19, 1977, lasted for four days and that *Pierre* was not filed until November 25, 1977. Hence, we realize that the District Court did not have the benefit of our holdings in *Pierre,* which was the first case involving capi-tal offenses under the criminal code enacted in 1973 considered by this Court and in which we specified, *inter alia,* that the burden of proof in the penalty phase in such cases rests with the State.

We cannot say that the errors that occurred here were harmless.[16] An inflammatory obscenity was inaccurately imputed to the defendant in the penalty phase, which arose from a violation of the District Court's Order. In this same penalty phase which lasted for just one hour and during which seven witnesses testified, a psychiatrist's report was received into evidence, counsel for the State and defense gave closing arguments, and the Court read instructions to the jury, this inflammatory obscenity became excessively vivified—and in the crucible of a single but awesome decision whether the defendant was to live by sentence of life imprisonment or to die by sentence of execution by the State.

In the guilt-determining phase of this trial, the State proved that the defendant committed a shocking and violent crime of murder in the first degree for the purpose of preventing a witness from testifying. Once the jury found that, then *another* decision in *another* hearing was required to determine which one of the two most serious penalties in law would be imposed.

▋ Scrupulous care must be exercised by the State in capital cases in both the guilt-determining and penalty phases in presentation of evidence and argument because of the acknowledged uniqueness of the death penalty. Mr. Justice Stevens' words in *Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1976) picture this uniqueness:

[F]ive Members of the Court have now expressly recognized that death is a different kind of punishment from any other which may be imposed in this country. *Gregg v. Georgia*, 428 U.S. 153, 181–188, 96 S.Ct. 2909, 2929–2932 (opinion of Stewart, Powell, and Stevens, JJ.) see *id.*, at 231–241, 96 S.Ct. 2971, at 2973–2977 (Marshall, J., dissenting); *Furman v. Georgia*, 408 U.S. at 286–291, 92 S.Ct. [2726], at 2750–2753 (Brennan, J., concurring), 306–310, 92 S.Ct. [2726], at 2760–2763 (Stewart, J., concurring) see *id.*, at 314–371, 92 S.Ct. [2726], at 2765–2794 (Marshall, J., concurring). From the

point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

▋ And that scrupulous care must particularly extend to evidence introduced by the State in the penalty phase where the evidence is probative but would not be admissible under the exclusionary rules of evidence in the guilt-determining phase. When the State offers this type of evidence in the penalty phase, it must be certain that it is not prejudicial to the defendant—prejudicial, of course, in a legal sense. See *Gregg, ante,* where Mr. Justice Stewart's quoted language bears repeating:

[S]o long as the evidence introduced . . . at the presentence hearing [does] not *prejudice* a defendant, it is preferable not to impose restrictions. [Emphasis added.]

Section 76–3–207(3) states:

Upon any appeal by the defendant where the sentence is of death, the supreme court, if it finds prejudicial error in the sentencing proceeding only, may set aside the sentence of death and remand the case to the trial court, in which event the trial court shall impose the sentence of life imprisonment.

As we have determined that there are two prejudicial errors that occurred in the penalty phase here, this case, pursuant to statute, is remanded to the District Court for the purpose of having that Court impose the sentence of life imprisonment upon the defendant. Affirmed in all other respects.

STEWART, Justice (concurring in the judgment):

I concur in the opinion of Justice Wilkins insofar as it sustains the guilty verdict, sets

---

**16.** See Rule 4, Utah Rules of Evidence.

aside the sentence, and remands for resentencing because of the trial court's failure to instruct the jury that the aggravating circumstances must outweigh the mitigating circumstances to justify a verdict of death. I also concur with Justice Hall insofar as he agrees that the jury must find that the aggravating circumstances outweigh the mitigating circumstances.

In *State v. Pierre*, Utah, 572 P.2d 1338, 1347–48 (1977), this Court stated:

> We hold that in the *penalty* phase of capital offenses the burden of proof necessary for a verdict of death over life imprisonment is on the State and that the totality of evidence of aggravating circumstances must therefore outweigh the totality of mitigating circumstances. . .

*    *    *    *    *    *

In Utah, the burden being on the State to convince the jury that the death penalty is appropriate by proof of total aggravation outweighing total mitigation, though written findings are not required, the basic concern mentioned by Mr. Justice Stewart in *Gregg*, at 428 U.S. 189, 96 S.Ct. 2932, "to minimize the risk of wholly arbitrary and capricious action" is more fully satisfied with respect to a standard of proof, we submit, than those standards approved in *Gregg* and *Jurek*

. . . .

I am unable to agree with any departure from this rule of law which was concurred in by four members of this Court. However, this statement of the law, although proper as far as it goes, does not inform the jury as to what standard should be employed in determining whether aggravating circumstances outweigh mitigating circumstances. The consequence of instructing the jury that it may impose a death sentence by finding merely that aggravating circumstances outweigh mitigating circumstances, is to weigh the penalty proceeding heavily in favor of the death penalty. That is not, in my view, what the Legislature intended.

Section 76–3–207 U.C.A. (1953), as amended,[1] and other sections of the crimi-

---

1. Section 76–3–207 provides:

Capital felony—Hearing on sentence.—
(1) When a defendant has been found guilty of a capital felony, there shall be further proceedings before the court or jury on the issue of penalty. The proceedings shall be conducted before the court or jury which found the defendant guilty, provided the defendant may waive hearing before the jury, in which event the hearing shall be before the court. In these proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence. The state's attorney and the defendant shall be permitted to present argument for or against sentence of death. Aggravating circumstances shall include those as outlined in 76–5–202. Mitigating circumstances shall include the following:
(a) The defendant has no significant history of prior criminal activity;
(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
(c) The defendant acted under extreme duress or under the substantial domination of another person;
(d) At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs;
(e) The youth of the defendant at the time of the crime;
(f) The defendant was an accomplice in the murder committed by another person and his participation was relatively minor;
(g) And any other fact in mitigation of the penalty.
(2) The court or jury, as the case may be, shall retire to consider the penalty. In all proceedings before a jury, under this section, it shall be instructed as to the punishment to be imposed upon a unanimous verdict for death and that to be imposed if a unanimous verdict for death is not found. If the jury reports unanimous agreement to impose the sentence of death, the court shall discharge the jury and shall impose the sentence of death. If the jury is unable to reach a unanimous verdict imposing the sentence of death, the court shall discharge the jury and impose the sentence of life imprisonment.

*    *    *    *    *    *

nal code, permit the penalty of death to be imposed only if the jury finds beyond a reasonable doubt that there are no mitigating circumstances sufficiently substantial to call for leniency.

Section 76–3–207 U.C.A. (1953), as amended, deals with the sentencing phase in a capital homicide case and sets forth specific mitigating circumstances; however, it does not specify the degree of persuasion necessary to justify the imposition of the death penalty. Sections 76–1–501 and 502 U.C.A. (1953), as amended, deal with the burden of proof with respect to all crimes and require that the State must prove every element of a crime beyond a reasonable doubt.[2] Even as to affirmative defenses, for which the defendant has the burden of producing proof, the burden of negating such defenses by proof beyond a reasonable doubt remains with the prosecution. *State v. Green*, 86 Utah 192, 40 P.2d 961 (1935); *State v. Harris*, 58 Utah 331, 199 P. 145 (1921); *State v. White*, 40 Utah 342, 121 P. 579 (1912); *State v. Vacos*, 40 Utah 169, 120 P. 497 (1911). See also § 76–1–502. Section 76–1–501 establishes proof beyond a reasonable doubt as the necessary degree of persuasion for the "culpable mental state" and "attendant circumstances," as well as all other elements of a crime. This language is clearly broad enough to encompass the guilt phase of a capital case.

Certainly no aspect of a capital proceeding has as great importance for the defendant as the sentencing phase. In every sense the possible deprivation of life which may follow from the penalty hearing is far more significant than the trial on guilt. The overriding importance of proving guilt beyond a reasonable doubt has been recognized by its adoption as a constitutional mandate, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), by its ancient origin, and by its common acceptance as an indispensable element of our criminal justice system. That stringent standard of proof is applied in the guilt phase to reduce the chance of error.

How much more appropriate it is to apply that standard when life itself is at stake and any error irreversible. It is at best anomalous that the issue of life or death should be decided on the basis of a burden of persuasion standard which is typically used to decide ordinary, run-of-the-mill civil cases.

Because of the structure of the Utah capital homicide provisions, due weight can be accorded mitigating circumstances by the jury only if the standard of persuasion is beyond a reasonable doubt as to the existence of mitigating circumstances. The Utah capital homicide provisions, unlike the capital homicide provisions of a number of other states, require proof of at least one "aggravating circumstance" beyond a reasonable doubt as part of proving a defendant guilty of a substantive offense. See § 76–5–202. In the *penalty* phase, after guilt has been proved, the jury is necessarily aware that it has found an aggravating circumstance beyond a reasonable doubt; and the prosecution, in arguing for imposition of the death penalty, will undoubtedly dwell upon that fact. If the jury may

---

**2.** Section 76–1–501 provides:

Presumption of innocence—"Element of the offense" defined.—(1) A defendant in a criminal proceeding is presumed to be innocent until each element of the offense charged against him is proved beyond a reasonable doubt. In absence of such proof, the defendant shall be acquitted.

(2) As used in this part the words "element of the offense" mean:

(a) The conduct, attendant circumstances, or results of conduct proscribed, prohibited, or forbidden in the definition of the offense;

(b) The culpable mental state required.

(3) The existence of jurisdiction and venue are not elements of the offense but shall be established by a preponderance of the evidence.

Section 76–1–502 provides:

Negating defense by allegation or proof—When not required.—Section 76–1–501 does not require negating a defense:

(1) By allegation in an information, indictment, or other charge; or

(2) By proof, unless:

(a) The defense is in issue in the case as a result of evidence presented at trial, either by the prosecution or the defense; or

(b) The defense is an affirmative defense, and the defendant has presented evidence of such affirmative defense.

impose death merely by finding that aggravating circumstances outweigh mitigating circumstances (a preponderance of evidence test) a death penalty is virtually assured.

The Utah statute was not intended to result in the imposition of a death penalty in all cases in which that penalty might possibly be imposed. The Legislature committed to the jury the responsibility to consider carefully, and thoughtfully weigh, all the individual characteristics of the defendant's mental and physical status, including the potential for rehabilitation, the possibility that the defendant may again commit a murder,[3] and all other circumstances bearing upon the determination of the penalty, see § 76–3–207. Not only is such deliberation and evaluation required by statute, but it is also constitutionally mandated. As stated in *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976):

> [I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

See also *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 973 (1978).

The evaluation of those factors depends upon the judgment of the sentencing authority, but the exercise of that judgment may not be used in a manner which results in the death penalty being "wantonly and . . . freakishly imposed." *Furman v. Georgia*, 408 U.S. 238, 309–10, 92 S.Ct. 2726, 2762 (1972). Accordingly, the power of judgment committed to the sentencing authority must, to the extent that it is possible, be exercised in a manner that is con-

sciously rational. "It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932 (1976).

Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given. See American Bar Association Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures, § 1.1(b), Commentary, pp. 46–47 (Approved Draft 1968); President's Commission on Law Enforcement and Administration of Justice: The Challenge of Crime in a Free Society, Task Force Report: The Courts 26 (1967). [428 U.S. at 192, 96 S.Ct. at 2934.]

It is therefore essential that the jury be instructed as to the proper burden of persuasion necessary to impose a death penalty. In *Gregg*, the Supreme Court stated:

> The idea that a jury should be given guidance in its decisionmaking is also hardly a novel proposition. Juries are invariably given careful instructions on the law and how to apply it before they are authorized to decide the merits of a lawsuit. It would be virtually unthinkable to follow any other course in a legal system that has traditionally operated by following prior precedents and fixed rules of law. [Footnote omitted.] See *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 498, 51 S.Ct. 513, 514, 75 L.Ed. 1188 (1931); Fed.Rule Civ.Proc. 51. When erroneous instructions are given, retrial is often required. It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations. [428 U.S. at 192–93, 96 S.Ct. at 2934.]

---

**3.** See Section 76–1–104:

> Purposes and principles of construction.—The provisions of this code shall be construed in accordance with these general purposes.
> (1) Forbid and prevent the commission of offenses;
> (2) Define adequately the conduct and mental state which constitute each offense and safeguard conduct that is without fault from condemnation as criminal.
> (3) *Prescribe penalties which are proportionate to the seriousness of offenses and which permit recognition or* [sic] *differences in rehabilitation possibilities among individual offenders.*
> (4) Prevent arbitrary or oppressive treatment of persons accused or convicted of offenses. [Emphasis added.]

Only if these principles are strictly adhered to can there be some reasonable degree of expectancy that the choice which the jury must make will be exercised untainted by individual biases, at least to the extent that jurors can consciously lay them aside. Whatever any one juror's concept of justice may be, the people of Utah, through the Legislature, have mandated that death be meted out as punishment in only the most egregious cases which are lacking any substantial mitigating circumstances.

If the jury applies only a preponderance of the evidence test in the penalty phase, the jury will in effect be induced to administer the Utah statute as if it were virtually a mandatory death penalty statute. A construction of the statute which all but assures infliction of the death penalty raises serious constitutional questions. A mandatory death penalty, or a scheme that is virtually mandatory, is unconstitutional. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). At the very least there will be a number of cases in which, because of the far greater latitude allowed for doubt under the preponderance of the evidence test, death will be inappropriately imposed. For the State to execute a defendant when there is substantial doubt on the part of the jury as to the appropriateness of that penalty, is repugnant to the basic values of our society. A preponderance of the evidence test simply does not reflect the policy of our death penalty statute, or the values upon which our criminal justice system is built.

Moreover, a preponderance of the evidence test is meaningless as a standard for deciding the critical issue and incapable of rational application. What basically is involved in the sentencing phase of a capital case is not a *weighing of evidence* to determine the existence *vel non* of a fact, but a legal-moral question: should a defendant, who is guilty of murder, live or die for that crime. Whether aggravating circumstances outweigh mitigating circumstances cannot be determined by the same mental processes by which direct and circumstantial evidence are evaluated for determining such questions as who entered an intersec-

tion first. The process of weighing and evaluating evidence to determine the existence of a factual proposition is a process common to the ordinary activities of life. The reference points are facts and inferences from facts; the process is one of logic and practical experience. The point of evaluating aggravating and mitigating circumstances in a capital case is not to prove a factual proposition but to determine a punishment. Section 76–3–207 provides, for example, that the youth of the defendant and a lack of significant history of prior criminal activity are mitigating circumstances. The youth of the defendant, or the lack of prior criminal activity, cannot be "weighed" in any meaningful sense against the aggravating facts. How does one find that the "fact" that the age of the defendant, whether 18 or 30 years, does or does not preponderate against an aggravating circumstance? How does one make such a determination if the defendant had a shoplifting conviction or embezzlement conviction ten years previous to the murder? To speak of weighing those factors against the aggravating circumstances is to employ an appealing but meaningless metaphor which in fact gives the mind no guidance in resolution of such an overwhelmingly important question.

The "beyond a reasonable doubt" standard may, of course, be considered similar in its function to proof by a preponderance of evidence, i. e., both standards are used to resolve factual disputes. However, the term "beyond a reasonable doubt" is something more than a standard for evaluating conflicting facts and inferences; in the context of a penalty hearing, it also conveys to the jury the concept that the values upon which the criminal justice system is built do not permit the ultimate sanction to be imposed unless the conclusion is free of substantial doubt of any kind. That standard would require more than a factual determination; it would, as contemplated by the statute, take into account the tolerable frailties of human beings. It is, after all, in deference to those frailties that the jury is required to consider mitigating circumstances.

Of course the standard which I think is required by the statute does not provide a mathematically precise test, but the nature of the inquiry does not admit of such a test. All that can be accomplished is to give the jury that guidance which is most likely to result in promoting the objectives of the statute in a manner that is most understandable to a jury.

In sum, I think the jury should be instructed that death should be imposed only if the jury is convinced beyond a reasonable doubt that there are no mitigating circumstances sufficiently substantial to call for leniency.[4]

MAUGHAN, Justice (concurring and dissenting with comment):

This concurring and dissenting opinion is written for the purpose of directing attention to what I consider to be fatal flaws in our statute as it relates to the death penalty. These flaws are fatal not only because of Constitutional infirmity, but they are fatal in a grimmer sense. The statute is virtually a mandatory death law. In addition, in my view it allows imposition of the capital sanction in a fashion which has heretofore been styled as "freakish," and without direction or limitation. Again, in my view, the statute does not provide proper guidelines "to minimize the risk of wholly arbitrary and capricious action."

Additionally, I wish to point out what I consider to be extreme anomalies in the enactments which control first and second degree murder. These are also constitutionally infirm. I concur in the conviction for homicide and in the remand for imposition of a life sentence, for the reasons stated. I respectfully dissent from the opinion remaining, with comments. All statutory references are to U.C.A.1953, as enacted 1973.

The judgment of the trial court imposing the death sentence is properly reversed, and the case remanded to the trial court to impose a sentence of life imprisonment. This action can be sustained upon alternative grounds, viz., there was prejudicial error in the sentencing proceeding, § 76–3–207(3); and the statutory provisions imposing the sentence of death are unconstitutional, § 76–3–207(4). This opinion will address the constitutional infirmities of the statutory scheme for imposition of the death penalty. The specific errors, which were prejudicial in the sentencing proceeding, are well treated and managed in the opinion of Mr. Justice Wilkins.

The Utah statutory plan violates the Eighth and Fourteenth Amendments to the United States Constitution in that there are "inadequate statutory guidelines to instruct the jury on the proper application of the mitigating and aggravating circumstances provided by law, thus leaving the jury with untrammeled discretion to impose or withhold the death penalty. Secondly, the death sentencing procedure inhibits perceptive judicial review.

To understand the constitutional infirmities in the statute, a review of the Supreme Court decisions since *Furman v. Georgia*[1] is beneficial. In *Gregg v. Georgia*[2] the court in commenting on the underlying principle of *Furman*, stated:

*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.[3]

4. The American Law Institute Model Penal Code (1962), which provided the basic framework for the capital punishment provisions of our criminal code, provides that the death penalty should be imposed only if "there are *no* mitigating circumstances sufficiently substantial to call for leniency." Section 210–6, p. 131.

1. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

2. 428 U.S. 153, 189, 96 S.Ct. 2909 (1976).

3. ". . . the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Furman v. Georgia*, 408 U.S. 238, 309–310, 92 S.Ct. 2726, 2763.

In testing the constitutionality, the ultimate issue is whether the sentencing procedures create a substantial risk the death penalty will be imposed in an arbitrary and capricious manner. In a series of five cases, the Supreme Court examined five diverse statutory plans for imposition of the death penalty. Three were held constitutional,[4] and two were found not to be constitutionally tolerable responses to *Furman's* rejection of unbridled jury discretion in the imposition of capital sentences.[5] From these five opinions, there are certain comments and observations which indicate the constitutional perimeters, within which the exercise of discretion in these challenged sentencing procedures can be made.

In *Gregg*, the court observed, under the Georgia statute, the jury was not required to find any mitigating circumstances in order to make a recommendation of mercy that was binding on the trial court. However, the jury must find a statutory aggravating circumstance before recommending a sentence of death.

In *Gregg*, the court explained it was possible to construct capital-sentencing systems capable of meeting Furman's constitutional concerns. One aspect to fulfill the requirements is to devise standards to guide a capital jury's sentencing deliberations. The court cited the standards formulated by the drafters of the Model Penal .Code, A.L.I., Model Penal Code § 201.6 (Tent. Draft No. 9, 1959) to illustrate it was possible to point to the main circumstances of aggravation and mitigation as a means of providing guidance to the sentencing authority. Doing so would reduce the likelihood of the imposition of an arbitrary or capricious sentence.

The court stated:

. . . Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.

In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.[6]

The admonition of the court is significant in assessing the Utah procedure:

We do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman*, for each distinct system must be examined on an individual basis. . . .[7]

In *Proffitt v. Florida*,[8] the procedures to ensure a sensible appellate review were noted. The trial court, after receiving an advisory sentence from the jury (which determines whether the aggravating circumstances outweigh the mitigating), must justify the imposition of the death penalty with written findings. Upon appellate review, the evidence of the aggravating and mitigating circumstances is reviewed and re-weighed to determine independently whether imposition of the ultimate penalty is warranted. In *Proffitt* it was urged the aggravating circumstances cannot be

---

4. *Gregg v. Georgia*, note 2 supra; *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

5. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

6. 428 U.S. 195, 96 S.Ct. 2935.

7. Id.

8. Note 4 supra.

weighed against the mitigating without the assignment of numerical weights by the legislature to each factor.

In response, the court said *Furman* was satisfied when the sentencing authority's discretion is guided and channeled by specific factors, thus eliminating arbitrariness and capriciousness. The trial court's sentencing discretion is guided and channeled by a system which focuses on the circumstances of each individual homicide. Thereafter, the Florida Supreme Court reviews each death sentence to ensure similar results in similar cases.

In *Jurek v. Texas*,[9] the Texas statutory scheme was found constitutional. Although Texas does not have statutory aggravating circumstances as Georgia and Florida have, the capital offenses have been confined to a small group of narrowly defined and particularly brutal offenses, which fulfill the same purpose. In the sentencing phase of the proceedings, the jury is required to respond to three statutory, designated questions. If the jury finds the State has sustained the burden of proving beyond a reasonable doubt, and the answer is in the affirmative to each of the questions, then the death sentence is imposed. The court stated:

> By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first degree murder case before a death sentence may even be considered. By authorizing the defense to bring before the jury at the separate sentencing hearing of whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death

sentences under law. Because this system serves to assure the sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution. . . .[10]

In *Woodson v. North Carolina*,[11] the court found a mandatory death sentence was not a constitutionally proper response to *Furman's* rejection of unbridled jury discretion in the imposition of capital sentences. The court observed that central to the limited holding in *Furman* was the concept that the vesting of standardless sentencing power in the jury violated the Eighth and Fourteenth Amendments. A mandatory death sentence papers over the problem of unguided and unchecked jury discretion. The mandatory North Carolina act provided no standards to guide the jury in the exercise of its power to determine who lives or dies. Furthermore, there was no way provided for the judiciary to check arbitrary and capricious exercise of the power through a review of the death sentence. The mandatory death sentence does not fulfill *Furman's* basic requirements, viz., arbitrary and wanton jury discretion be replaced with objective standards to guide, make regular, and rationally reviewable, the process for imposing sentence of death. Since there is a qualitative difference in the sentence of death, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

Louisiana also responded to *Furman* by enacting a mandatory death penalty; however, there was requirement that four verdict forms setting forth first and second degree *murder, manslaughter,* and *not guilty,* be submitted to the jury, whether raised by the evidence or requested by defendant. In *Roberts v. Louisiana*[12] the court said Louisiana's definition of murder, although more narrow than that of North Carolina's, was not of controlling constitutional significance. The constitutionally

9.  Note 4 supra.

10.  428 U.S. 276, 96 S.Ct. 2958.

11.  Note 5 supra.

12.  Note 5 supra.

proscribed vice of mandatory sentencing was the lack of focus on the circumstances of the particular offense and the character and propensities of the offender. The diversity of circumstances presented by cases within a single category of killings during the commission of a specified felony, as well as the variety of possible offenders, underscores the rigidity of Louisiana's enactment and its similarity to the North Carolina statute. There was no opportunity for consideration of mitigating factors presented by the circumstances of the particular crime, or by the attributes of the individual offender. The mandatory sentence also fails to comply with *Furman's* requirement that standardless jury discretion be replaced by procedures which safeguard against arbitrary and capricious imposition of death sentences. The court observed the Louisiana procedure neither provided standards to channel jury judgments, nor permitted review to check the arbitrary exercise of the capital jury's de facto sentencing discretion. As in North Carolina, there were no standards provided to guide the jury in the exercise of its power to select those first degree murderers who would receive the death sentence, and no possibility of a discerning appellate review of the jury's decision.

Further substance to the court's concept of perceptive appellate review was provided in *Gardner v. Florida* : [13]

> . . . Since the State must administer its capital sentencing procedures with an even hand [Citation], it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed. Without full disclosure of the basis for the death sentence, the Florida capital-sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in *Furman v. Georgia.*
>
> . . .

From the foregoing cases, certain general concepts emerge. There must be discretion conferred on the sentencing body in capital cases to consider the circumstances of the particular crime and the attributes of the individual offender. However, this discretion must be directed and limited by a means designed with the specific purpose of minimizing the risk of arbitrary and capricious action by the sentencing body. Finally, there must be a sufficiently definite specification or identification of the factors relied upon by the sentencing authority, in reaching its decision, so perceptible judicial review is available to ensure the sentence has not been imposed capriciously or in a freakish manner.

The Utah statutory plan for imposition of the death penalty does not comply with these minimal requirements. To hold the statutory scheme constitutional requires elevation of form over substance. Section 76–5–202(1) sets forth the aggravating circumstances which are incorporated as elements of the capital crime of first degree murder. Although these circumstances are more numerous than the five under the Texas statute, they do fulfill the requirement for statutory aggravating circumstances. During the guilt phase of the proceeding, at least one of these aggravating circumstances must be found beyond a reasonable doubt, by the fact finder, or the defendant is not subject to a capital sentence. During the sentencing phase of the proceeding, under § 76–3–207(1), in addition to the statutory aggravating circumstances, the sentencing body hears evidence as to any matter the court deems relevant in aggravation or mitigation of the sentence. Since the jury makes no findings, and aggravating circumstances other than the statutory ones are considered, it is impossible for an appellate court to conduct a discerning review to determine the precise considerations which motivated the verdict of death. The same type of problem applies regarding the mitigating circumstances, for there is no means by which the appellate court can determine whether the jury did not believe the evidence, disregarded it, or found the evidence insufficient.

**13.** 430 U.S. 349, 361, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977).

The most serious deficiency in the Utah statutory scheme is the total failure to supply any guidelines to the sentencing authority in the assessment of the mitigating and aggravating circumstances. The statute neither states who has the burden of proof nor the quantum of this burden in assessing the aggravating and mitigating circumstances. Through this omission the sentencing authority, in effect, has unbridled discretion to determine who shall die and who shall live.

In *State v. Pierre*,[14] this Court compensated for the legislative omission by supplying the guidelines. In *Pierre*, the trial judge had instructed the jury the State had the burden to prove a death sentence was appropriate. In the instant case, the trial court adhered to the statutory provisions in § 76–3–207(2) and no instruction concerning the burden of proof or its quantum was given. In *Pierre*, this Court held, in the penalty phase of capital offenses, the burden of proof for a verdict of death was on the State, and the totality of evidence of aggravating circumstances must therefore outweigh the totality of mitigating circumstances.

As noted in the opinion of Mr. Justice Wilkins, the opinion in *Pierre* became public after the matter at hand was tried.

In *Jurek*, where the aggravating circumstances are, in effect, incorporated as an element of the capital offense; and, as in Utah, are determined by the fact finder beyond a reasonable doubt during the guilt phase of the proceeding, the same burden of proof is imposed on the state during the penalty phase.

However (again in *Jurek*), specifically, the jury must answer the following three questions in the penalty phase; after receiving evidence of the mitigating circumstances:

(1) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) If raised by the evidence whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. Art. 37.071(b) (Supp.1975–1976).

The death sentence is imposed, only if the jury finds the State has proved, beyond a reasonable doubt, the answer to each of the three questions is affirmative. If the answer to any of the questions is negative, a sentence of life imprisonment is imposed.[15]

The Utah statute lacks a counter-balance similar to that of Texas. Namely, Utah does not require the state to sustain a similar burden (beyond a reasonable doubt) concerning the circumstances in mitigation, as it does during the guilt phase in regard to statutory aggravation.

Although the *Pierre* test is effective in states such as Georgia and Florida where the sentencing body finds both the aggravating and mitigating circumstances and weighs them during the penalty phase, it has the effect under the Utah statutory scheme of creating a mandatory death penalty. Specifically, since the aggravating circumstances (the statutory ones) have already been proved under a standard of proof which is of the greatest magnitude in the judicial system (beyond a reasonable doubt), the aggravating circumstances must necessarily always outweigh the mitigating circumstances. In effect, the mitigating circumstances must attain a level of proof of a magnitude unknown or unidentified in the legal system; to *outweigh* the aggravating circumstances. The present statute does not even have the latitude of the prior Utah statute, § 76–30–4, which permitted the jury to recommend leniency.

14. Utah, 572 P.2d 1338, 1347–1348 (1977).

15. See *Jurek v. Texas*, 428 U.S. 262, 269.

The Utah statutory plan has a format similar to the Model Penal Code [16] the standards of which were commended in *Gregg v. Georgia.*[17] However, the aggravating circumstances, which are first determined in the penalty phase under the Model Penal Code, are engrafted into the guilt phase in the Utah Code, and become one or more elements of first degree murder, § 76–5–202(1)(a) through (h). Both Codes set forth similar mitigating circumstances in the penalty phase, § 76–2–307(1)(a) through (g). The Utah Code is silent and provides no guidelines as to the manner in which the sentencing body deals with the mitigating and aggravating circumstances. The Model Penal Code supplies these deficiencies. Section 210.6(2) provides:

> The court in exercising its discretion as to sentence, and the jury, in determining upon its verdict, shall take into account the aggravating and mitigating circumstances enumerated in Subsections (3) and (4) and any other facts that it deems relevant, *but it shall not impose or recommend sentence of death unless it finds one of the aggravating circumstances enumerated in Subsection (3), and further finds that there are no mitigating circumstances sufficiently substantial to call for leniency.* When the issue is submitted to the jury, the Court shall so instruct. . . .[18]

In my opinion, if the jury has *any* doubt the death penalty is proper, it should not impose the penalty; and it should be so instructed.

The Model Code format clearly guides and channels the sentencing authority's discretion and thus averts arbitrariness and capriciousness. Furthermore, the guidelines provide a basis for cognitive appellate review, viz., does the evidence support the finding there were no mitigating circumstances sufficiently substantial to call for leniency. In contrast, the Utah statute, through legislative omission, leaves the sentencing body with carte blanche discretion in its evaluation of the aggravating and mitigating circumstances.

Furthermore, even with the *Pierre* balancing standard, which has no statutory authority,[19] there can be no appellate review, with cognition, for the court is left to speculate whether the sentencing body did not believe the evidence of mitigating circumstances, or whether it was determined the aggravating outweighed the mitigating facts.

The deficiencies in the Utah statute are vividly illustrated in the matter at hand. There was a substantial amount of evidence defendant had ingested rather substantial quantities of drugs (Preludin and Valium) and alcohol (whiskey and beer) prior to the murder. In addition, there was included in evidence, during the penalty phase of the proceeding, a psychiatric report stating defendant had acted in a state of diminished capacity, without the ability to reason, caused by intoxication and drugs. Such evidence supports a statutory mitigating circumstance, § 76–3–207(1)(d):

> At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement[s] of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs;

The jury was given no instruction concerning the manner in which this circumstance should be appraised, vis-a-vis, with

---

16. A.L.I., Model Penal Code, Proposed Official Draft, § 210.6, pp. 128–132; also see A.L.I., Model Penal Code, Tentative Draft No. 9, pp. 59–63.

17. 428 U.S. 193–195.

18. Id. at p. 130. [Emphasis supplied.]

19. See *Coker v. Georgia*, 433 U.S. 584, 589–591, 97 S.Ct. 2861, 2865, 53 L.Ed.2d 982 (1977) wherein it is stated: "The court also instructed, pursuant to statute, that even if aggravating circumstances were present, the death penalty need not be imposed if the jury found they were outweighed by mitigating circumstances; that is, circumstances not constituting justification or excuse for the offense in question, 'but which, in fairness and mercy, may be considered as extenuating or reducing the degree' of moral culpability or punishment. . . . ." [Emphasis supplied.]

the statutory aggravating circumstances, as well as the other facts in evidence, in the penalty phase proceeding. Thus, this Court on review is left to speculate whether the jury disbelieved the evidence concerning this statutory mitigating circumstance, ignored the statute, or attributed little weight to it. The record does not disclose to this court the basis and considerations which motivated the death sentence.[20]

An examination of the instruction to the jury during the penalty phase clearly reveals the constitutional infirmities in the Utah statutory plan. Significantly, the instruction adheres to § 76–3–207(2),[21] which is the only statute concerning instruction to the jury during the penalty phase.

The court instructed the jury as follows:

Members of the Jury:

Having found the defendant guilty of the crime of criminal homicide, murder in the first degree, which is a capital felony, you now, under the law, have a responsibility with respect to the sentence for that crime.

The law provides that when a defendant has been found guilty of a capital felony there shall be a further proceeding on the issue of penalty. The penalty which will ultimately be imposed as provided by law is either death or life imprisonment.

The law provides that evidence may be presented to you as to any matter the court deems relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. The State's attorney, the defendant's attorneys and the defendant are and will be permitted to present evidence and arguments for or against the sentence of death.

With respect to mitigating circumstances, the law provides that you may consider the following:

(a) The defendant has no significant history of prior criminal activity;

(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

(c) The defendant acted under extreme duress or under the substantial domination of another person;

(d) At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs;

(e) The youth of the defendant at the time of the crime;

(f) The defendant was an accomplice in the murder committed by another person and his participation was relatively minor;

(g) Any other fact in mitigation of the penalty.

The law further provides that if you return a unanimous verdict for death, then that sentence is to be imposed by the Court. On the other hand, if you do not reach a unanimous verdict of death, then the Court is required to impose a sentence of life imprisonment.

The parties to this proceeding, that is, the State of Utah and the defendant, may now proceed to bring before you such aggravating and mitigating circumstances as may be relevant to the sentence to be imposed, and at the conclusion of the proceedings you will retire for

---

**20.** *Gardner v. Florida*, note 13 supra.

**21.** "The court or jury, as the case may be, shall retire to consider the penalty. In all proceedings before a jury, under this section, it shall be instructed as to the punishment to be imposed upon a unanimous verdict for death and that to be imposed if a unanimous verdict for death is not found. If the jury reports unanimous agreement to impose the sentence of death, the court shall discharge the jury and shall impose the sentence of death. If the jury is unable to reach a unanimous verdict imposing the sentence of death, the court shall discharge the jury and impose the sentence of life imprisonment."

deliberation thereon. When in the course of your deliberations you either reach a unanimous verdict for death or you become reasonably satisfied that such unanimous verdict will not be rendered, then you will notify the officer having you in charge who will conduct you into court.

I will hand you herewith two forms, one of which is denominated Sentence Verdict and the other has no denomination.

The sentence verdict reads:

"We, the Jury impanelled in the above entitled cause, having heretofore found the defendant guilty of criminal homicide, murder in the first degree, render a verdict for death."

The other form reads:

"Our deliberations have been concluded, and we are reasonably satisfied that we will not reach a unanimous verdict for death."

The foreman will sign the appropriate form and not the other, and bring both forms into court.

You may take this instruction with you to the jury room.

Dated this 22nd day of September, 1977.

---

Hon. Allen B. Sorensen
Judge.

Under this instruction, the jury had untrammeled discretion to impose or withhold the death penalty. The mere recital of the statutory mitigating circumstances in the instruction, without any guidance as to its usage or weight, did not suitably direct or limit the discretion of the jury so as to minimize the risk of wholly arbitrary and capricious action.[22] The conclusion is compelling, the Utah statutory scheme for imposition of the death penalty violates the Eighth and Fourteenth Amendments of the United States Constitution, and Art. I, § 9, Constitution of Utah.

With reference to the prejudicial error of the inadmissible testimony, I wish to make comment. This error may be deemed of constitutional dimension. The Utah Constitution, Article I, Section 12, provides:

In criminal prosecutions the accused shall have the right . . . to be confronted by the witnesses against him . . .

Although, it is not necessary to go further, it is well to note, in *Gregg*, the court expressed approval of a procedure which does not unnecessarily restrict the evidence that can be offered at the penalty hearing. The court admonished:

. . . So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions.[23]

In *Presnell v. Georgia*,[24] the court stated the fundamental principles of procedural fairness apply with no less force at the penalty phase of a trial in a capital case than they do in the guilt-determining phase of any criminal trial. In *Gardner v. Florida*,[25] the court observed that in a capital case, the sentencing process must satisfy the requirements of the Due Process Clause. The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence. The court stated consideration must be given to the quality as well as the quantity of the information upon which the sentencing body may rely. In *Gardner* the court found, in a capital case, the interest in the reliability of the information used in the sentencing process outweighed other asserted interests of the State.[26]

This case is analogous to *Gardner*, where the trial judge used confidential information in the process of determining to sentence the defendant to death. The court ruled defendant was denied due process of

---

22. *Gregg v. Georgia*, note 2 supra.

23. 428 U.S. 203–204, 96 S.Ct. 2939.

24. 439 U.S. 14, 15, 99 S.Ct. 235, 236, 58 L.Ed.2d 207, 211 (1978).

25. Note 13 supra.

26. 430 U.S. at 358–359, 97 S.Ct. at 1204–1205.

law, when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain. Since defendant Brown's death sentence was based, in part, on information (hearsay on hearsay) that was unreliable, and where he had no opportunity to confront his accuser, he was denied due process of law.

Even if there were a reasonable doubt as to whether this error were prejudicial, this court has ruled the doubt should be resolved in favor of the defendant, especially where the error violates a defendant's constitutional rights.[27]

### The Anomaly of Section 76–5–202

Another aspect of constitutional dimension which merits consideration is the arbitrary and unreasonable classification of second and first degree murder.

Section 76–5–202(1) provides:

(1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances: . . .

Section 76–5–203 provides:

(1) Criminal homicide constitutes murder in the second degree if the actor:

(a) Intentionally or knowingly causes the death of another; . . .

A person convicted of murder in the first degree is subject to the death penalty, and a person convicted of second degree murder is subject to a term of imprisonment of not less than five years, and may be for life. Both degrees of murder require the actor intentionally or knowingly cause the death of another, the distinction in classification involves the eight circumstances set forth in subdivisions (a) through (h) inclusive in § 76–5–202(1), the first degree murder statute.

A legislative classification is never arbitrary or unreasonable so long as the basis for differentiation bears a reasonable relation to the purposes or objectives to be accomplished by the act. If some persons or transactions, excluded from the operation of law, were as to the subject matter of the law in no differentiable class from those included within its operation, the law is discriminatory in the sense of being arbitrary and unconstitutional. . . .[28]

The objective or functions of the death penalty are purported to be retribution, i. e., a vindication of society's moral outrage at particularly offensive conduct and a possible deterrence of capital crimes by prospective offenders.[29]

The most offensive, brutal, cold-blooded homicide is second degree murder if its circumstances are not within those specified in § 76–5–202(1). If "A" rapes and murders a woman, it is first degree murder, subdivision (1)(d). If "B" tortures and murders a woman without raping her and dissects her body, it is second degree murder. If "A" murders two people at the same time, it is first degree murder, subdivision (1)(b). If "B" murders a dozen people, each at a separate time, each murder is in the second degree. If "A" commits a murder after he has previously been convicted of first or second degree murder, it is first degree murder, subdivision (1)(g). If "B" commits a number of murders prior to any conviction for this continuing conduct, each murder is in the second degree. If "A" kills his father to inherit his property, it is first degree murder, subdivision (1)(f). If "B" kills his father because he knows his father disinherited him, it is second degree murder. If "A" kills someone for some pecuniary or personal gain, it is first degree murder, subdivision (1)(f). If "B" kills someone for the thrill or personal enjoyment in killing, it is second degree murder.

In the matter before us, defendant could not have been convicted of first degree murder if he could have convinced the jury his purpose was not to prevent the victim

---

27. *State v. Eaton*, Utah, 569 P.2d 1114 (1977).

28. *Leetham v. McGinn*, Utah, 524 P.2d 323, 325 (1974).

29. *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–2930.

from testifying in a legal proceeding, subdivision (1)(h), but rather he killed because the victim had irritated him. Furthermore, if defendant had murdered the victim, *after* he had testified, although motivated by vengeance, he would have been guilty of second degree murder. Admittedly, the timing would have been important; defendant would have had to kill the victim after he testified and before he was convicted of second degree murder.

The foregoing examples illustrate the persons or transactions excluded from the operation of the first degree murder statute are, as to the subject matter of that statute, in no differentiable class from those included in its operation. The basis for differentiation between the two classes of murder does not bear a reasonable relationship to the avowed purposes or objectives to be accomplished by the death penalty, viz., vindication of society's outrage at particularly offensive conduct and the claimed deterrent value. The classification is arbitrary and unreasonable and the law is discriminatory and unconstitutional on the grounds the heinous crimes excluded from the first degree murder statute are, as to the subject matter, not differentiable from those included.

The unconstitutional aspect could be equally based on the Eighth and Fourteenth Amendments on the ground the classification between first and second degree murder provides, in effect, a random and arbitrary imposition of the death penalty.

HALL, Justice (concurring and dissenting):

I concur in affirming the conviction, but dissent from that portion of the main opinion which reverses the judgment imposing the death penalty.

The main opinion acknowledges that the issue relating to the trial court's "failure" to instruct on the burden of proof to be borne by the state at the penalty phase was never raised below nor on appeal. It is also of particular note that no exceptions were taken to the court's instructions as given. In addressing the matter *sua sponte*, the main opinion would appear to misconstrue the purpose of the bifurcated trial and grossly distorts its function, meaning and effect. In the case of *Gregg v. Georgia*,[1] the United States Supreme Court approved a bifurcated proceeding similar to that adopted in Utah. The reason for separating a determination of guilt from a determination of penalty is to avoid the constitutional pitfalls which exist in the automatic imposition of the death penalty following conviction of a capital crime.[2] As stated in *Gregg*,

> Much of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question. [Citation omitted.] This problem, however, is scarcely insurmountable. Those who have studied the question suggest that a bifurcated procedure—one in which the question of sentence is not considered until the determination of guilt has been made—is the best answer.

Although we are dealing with a two-step decision process, the "guilt" evidence may well overlap with the "penalty" evidence. Indeed, no additional evidence need be submitted.[3] At the penalty phase, both the prosecution and the defense have the opportunity to present any additional evidence of aggravation or mitigation they may have, but neither has any burden to go forward. Indeed, they may elect not to offer any additional evidence and merely argue the propriety of imposing the death penalty based on the evidence adduced at the guilt phase. (As was done in *Gregg*). For pur-

1. 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

2. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

3. In *Gregg*, the Court held that "[e]vidence considered during the guilt stage may be considered during the sentencing stage without being resubmitted."

poses of sentencing a defendant to death, the jury need only find that, from the "totality of the evidence," the aggravating circumstances outweigh the mitigating circumstances.[4]

The penalty phase is not an adversary proceeding in the traditional sense; rather, it is a neutral proceeding whereby both prosecution and defense are afforded the opportunity of apprising the jury of circumstances not already before it regarding defendant's character, background, history, mental and physical condition and other facts in aggravation or mitigation of the penalty.[5] Also, the court itself is afforded the opportunity of becoming directly involved in this evaluation process, since the statute provides that "[i]n these proceedings, evidence may be presented as to any matter the court deems relevant to sentence . . . ."[6] The jury then weighs the aggravating circumstances against the mitigating circumstances to determine the penalty to be imposed.[7]

While the main opinion cites no authority in support of its analysis, *Gregg* contains language consistent with the foregoing. In affirming the judgment, the Court recited the facts in *Gregg* as follows:

At the penalty stage, which took place before the same jury, neither the prosecutor nor the petitioner's lawyer offered any additional evidence. Both counsel, however, made lengthy arguments dealing generally with the propriety of capital punishment under the circumstances and with the weight of the evidence of guilt. The trial judge instructed the jury that it could recommend either a death sentence or a life prison sentence on each count. The judge further charged the jury that in determining what sentence was appropriate the jury was free to consider the facts and circumstances, if any, presented by the parties in mitigation or aggravation.

Finally, the judge instructed the jury that it "would not be authorized to consider [imposing] the penalty of death" unless it first found beyond a reasonable doubt one of these aggravating circumstances: [The court then listed three of the statutory aggravating circumstances in Georgia.]

Regarding the court's final instruction quoted above, it is of note that in Georgia, a jury can convict a defendant of a capital offense without even considering aggravating circumstances.[8] Evidence of aggravation need not be submitted by the prosecution until the penalty phase,[9] at which time at least one aggravating circumstance must be found beyond a reasonable doubt before the jury can consider imposing the penalty of death. After so finding, aggravation is weighed against mitigation in determining the penalty. In Utah, before a jury can even convict a defendant of first degree murder, it must find that at least one aggravating circumstance has been proven beyond a reasonable doubt.[10] Then, at the penalty phase, the jury is to weigh evidence of aggravation against evidence of mitigation in passing upon a sentence. It would therefore appear that Utah's procedure offers even additional protections to a defendant, not present in Georgia's procedure which has been specifically approved by the United States Supreme Court.

For the foregoing reasons, it was not incumbent upon the court to give a specific instruction as to burden of proof in the instant case, especially where neither party requested it.

The main opinion also bases its decision on the prejudicial effect of certain testimo-

4. *State v. Pierre,* Utah, 572 P.2d 1338 (1977), cert. denied, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

5. An instruction to this effect was given at the penalty phase of the trial.

6. U.C.A., 1953, 76–3–207.

7. Supra, footnote 4.

8. See Georgia Code Ann. § 26–1101 (1972).

9. See Georgia Code Ann. § 27–2534.1 (Supp. 1975).

10. Aggravation is, in fact, an element of the offense. U.C.A., 1953, 76–5–202.

ny admitted at the penalty phase. It is my opinion that even assuming, arguendo, that the testimony of Watson was improperly admitted,[11] the testimony of other witnesses clearly show that aggravation outweighed mitigation in the instant case. Several persons testified in the guilt phase of the trial that defendant had used the same and similar obscenities and had used other language which reflected the same callous disregard for human life as was testified to by Watson. The jury's consideration of these other testimonies assuages any possible error and renders it harmless.[12]

Given the overwhelming totality of the aggravating circumstances and the extreme paucity of evidence offered in mitigation, it is obviously not to be said that the death penalty was imposed as the result of the arbitrary and capricious action of an aberrant jury. On the contrary, the record of trial before us adequately supports the verdict of death. The acts of defendant in committing this unusually serious and shocking crime of raw violence, heedless of human life, were proven—and proven in the environs of a fair and just trial.

I would affirm the verdicts and the judgment.

CROCKETT, Chief Justice (concurring with affirmance of conviction, but dissenting as to interference with judgment):

I agree with the main opinion's affirmance of the defendant's conviction. But I am unable to see it as consistent with judicial prerogative or responsibility to nullify the jury's recommendation, and the judgment entered thereon by the trial court. These done after extended trial in careful conformity with the law and conscientious consideration of all aspects of the case by both the court and the jury.

In preface to the observations in this partial dissent, I think it appropriate to observe that I do not regard it as a proper prerogative or concern of this writer, nor of the Courts or the Justices thereof, to permit any personal predilections to justify rationalizations one way or the other in regard to the propriety or efficacy of the death penalty. The making of the laws and the prescribing of the manner in which they are to be carried out is the prerogative and the responsibility of the legislature. Whereas, it is the bounden duty of judges to see that those laws are carried out in accordance with their intent and purpose, without compunction or distortion resulting from our own notions as to what the law ought to be.

The main opinion commendably and correctly discusses and disposes of the defendant's assignments of error in attacking his conviction. But I am impelled to disagree with the position that there was error in failing to instruct as to the burden of proof in the "penalty phase" of the proceeding.

In the trial of the case as to the guilt or innocence of the defendant, the court fully, carefully and repeatedly instructed the jury as to the presumption of the defendant's innocence and that the burden was upon the State to prove each and all of the elements of the charge against him beyond a reasonable doubt.

From an examination of the statutes prescribing procedure in such cases, it is abundantly clear that the legislature intended that if an accused is found guilty of the capital felony, then in the subsequent penalty phase of the proceedings any formalities of procedure are to be relaxed for the purpose of full inquiry, and the receiving of any information, either on behalf of the defendant, or of the State, as to any matters of aggravation or mitigation which should be considered on the problem as to the penalty to be imposed.

The view just stated is borne out by Sec. 76–3–207, U.C.A. 1953, which provides for such subsequent hearing and states in part that:

. . . In these proceedings, *evidence may be presented as to any matter*

---

11. But see the separate opinion by Chief Justice Crockett which interprets U.C.A., 1953, 76–3–207.

12. That this Court cannot reverse a jury verdict for harmless error, see Rule 4, Utah Rules of Evidence.

*the court deems relevant* to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. *Any evidence* the court deems to have probative force *may be received regardless of its admissibility under the exclusionary rules of evidence.* [Emphasis added.]

It is further significant to note that, in so prescribing the procedure, that statute does not impose any requirement as to burden of proof. I see no disharmony with the observation made in *State v. Pierre*[1] that "the totality of evidence of aggravating circumstances must therefore outweigh the totality of mitigating circumstances." Simply stated, unless that is the case, a death sentence could not and would not be imposed. That is so obviously a matter of common sense as would not require further explanation to the jurors. Particularly so, when they had already been told several times that it was the State's burden to prove beyond a reasonable doubt every element of the accusation against the defendant; and there had been no other instructions given as to any other burden of proof in the proceedings.

It is also worthy of note that neither the defendant nor the State made any request for any such further instruction in the trial court, nor raised any such point in this Court. However, I certainly have no disagreement with the proposition that in matters of such serious import, if it appears that there is any reasonable likelihood that any prejudice to the defendant may have resulted because of any error or omission, this Court should take notice thereof and correct it on its own initiative.[2] However, that is not the case here. It is my impression that the main opinion, in acting on its own motion to raise the question as to an instruction on burden of proof in the penalty phase of the trial, constitutes a specious but unrealistic objection, which may well be related to reservations because of the seriousness of the death penalty (a matter which I emphasize is properly of legislative and not of judicial concern) and has the effect of interfering with and defeating the express legislative intent as to the processes of justice, rather than carrying them out.

Notwithstanding the gravity of this matter, it seems to me inescapable that, however unpleasant and stark the realities of the situation may be, the facts should be faced up to that in the guilt phase of the trial, both sides had ample opportunity to present all of their evidence and arguments to the court and jury; and that when they arrived at the penalty phase of the trial, both sides likewise were afforded full and fair opportunity to present whatever facts they thought might bear upon the questions of mitigation or aggravation.

Upon review, it is the duty of this Court to assume that the jury believed those aspects of the evidence which support their verdict and their recommendation. Under that assumption, the sordidness of this crime could hardly be overstated. The main opinion correctly characterizes it as "a shocking and violent crime of murder in the first degree for the purpose of preventing a witness from testifying" against defendant. In accepting the jury's view of the evidence, it seems indisputably plain that the defendant, in truculent and arrogant defiance of the law, had appointed himself as the executioner of Steven Losh; that the defendant set up a plan for and carried out a heartless and cold-blooded execution upon the victim when he was cowed down in submission and begging for mercy; and that the vileness and vulgarity of his conduct in what was done and said, both preceding and following that crime are properly characterized as manifesting unspeakable depravity. Under that version of facts as accepted by the jury, the verdict and recommendation they arrived at is hardly surprising.

Correlated to what has been said above, and having a bearing on the issue under

---

1. Utah, 572 P.2d 1338 (1977).

2. *State v. Cobo*, 90 Utah 89, 60 P.2d 952 (1936).

discussion here, the vital question is: Was there any error or omission in the sentencing phase of the proceeding which was prejudicial to the defendant? It is submitted that upon a fair and objective view of the total situation, it appears without doubt that neither any failure to instruct, nor any error in the receipt of evidence, had any such adverse effect upon the defendant or the judgment rendered that there is any reasonable likelihood that there otherwise would have been a different result.[3]

There is this final observation to be made. Our law assures this defendant, and all other persons accused of crime, numerous and ample rights and protections against the conviction or punishment of the innocent,[4] all of which appear to have been properly and carefully accorded this defendant. Nevertheless, if there is anything of any nature whatsoever which yet bespeaks clemency in his behalf, including any subsequent expiatory conduct, our law provides for still further consideration of the problem by our Board of Pardons, which has the unrestricted power to commute a death sentence, if it is persuaded that that is the proper thing to do.[5]

On the basis of what has been said herein, it is my opinion that the defendant has had his full and fair entitlement under our law, and that there has been no error or impropriety therein which would justify this Court's interference with the verdict and the judgment; and that it is therefore our duty to affirm them.

3. *State v. Wells*, Utah, 603 P.2d 810 (1979) and authorities cited therein.

4. Art. I, Sec. 12, Utah Constitution.

5. Art. VII, Sec. 12, Utah Constitution.